Argued and submitted November 6, 2007, judgment of conviction and sentence of
death affirmed December 31, 2008

# STATE OF OREGON,
*Respondent,*

*v.*

# MICHAEL ANDRE DAVIS,
*Appellant.*

## (CC 020633788; SC S053071)

201 P3d 185

Robin A. Jones, Senior Deputy Public Defender, Salem, argued the cause for appellant. With her on the briefs were Ingrid Swenson, Executive Director, Peter Gartlan, Chief Defender, and Meredith Allen, Deputy Public Defender, Office of Public Defense Services.

David B. Thompson, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor

General, and David B. Thompson, Kaye McDonald, Timothy A. Sylwester, and Heather Vogelsong, Assistant Attorneys General.

LINDER, J.

Walters, J., concurred and filed an opinion.

## LINDER, J.

On November 3, 1991, Gerald Phillips and Belinda Flannigan were found dead in Room 24 at the Ara'Bel Motel in Portland. Detectives investigated the case for several weeks after the murders, and again in 1996, but came up with no solid leads until 2002. Following its investigation of the case in 2002, the state charged Michael Andre Davis (defendant) and Edgar Lee Foreman with several counts of aggravated murder for the deaths of Phillips and Flannigan.[1] Before trial, defendant and Foreman unsuccessfully moved to dismiss the charges on the ground of preindictment delay. The cases were severed for trial, and the charges against Foreman were dismissed without prejudice. The case continued against defendant and, on October 28, 2005, a jury found him guilty of all counts. After a penalty-phase proceeding, the trial court sentenced defendant to death.

The case is now before this court on automatic and direct review of defendant's judgment of conviction and sentence of death. ORS 138.012(1). Defendant raises 14 assignments of error, which he organizes into four categories: (1) pretrial issues; (2) issues raised during trial; (3) constitutionality of Senate Bill (SB) 936 (1997); and (4) constitutionality of Oregon's death-penalty scheme. In our view, four of defendant's assignments of error merit discussion: (1) defendant's assertion that the trial court erred in denying defendant's motion to dismiss for preindictment delay; (2) defendant's assertion that the trial court erred in denying defense counsel's motions to withdraw; (3) defendant's assertion that the trial court erred in denying defendant's motion for a mistrial based on the prosecutor's reference in his opening statement to the testimony of a witness who failed to appear at trial; and (4) defendant's assertion that the trial court erred

---

[1] The state originally indicted defendant and Foreman on July 16, 2002; due to further developments in the case, that indictment was dismissed. On November 8, 2002, defendant and Foreman collectively were reindicted on eight counts of aggravated murder with a firearm and four counts of aggravated felony murder with a firearm, and Foreman individually was indicted on two additional counts of felony murder. For purposes of this review, the operative pleading is the subsequent indictment of defendant for those first 12 counts.

in refusing to admit evidence of the contents of a police report.[2] For the reasons set forth below, we reject defendant's claims of error and, therefore, affirm his convictions and sentence of death.

## I. FACTS AND PROCEDURAL BACKGROUND

We view the evidence in the light most favorable to the state, because the jury found defendant guilty. *See State v. Bowen*, 340 Or 487, 489, 135 P3d 272 (2006), *cert den*, 549 US 1214 (2007) (stating that standard). On Sunday, November 3, 1991, the manager of the Ara'Bel Motel noticed that the door to Room 24 was open. That room was registered to Belinda Flannigan. The manager looked inside and saw a bloodied man against the wall. The manager immediately called the police. Upon entering the room, the police found the bodies of Gerald Phillips and Belinda Flannigan.

Detective Hill served as the lead detective on the case, and Detectives Norman and Yamasaki joined her. Detectives and criminalists photographed and videotaped the scene extensively. Inside the room, investigators found four .45 caliber shell casings, all of which had been fired from the same pistol, and three spent bullets. (The fourth spent bullet was later found in Phillips's body.) Investigators also found several personal items and recently purchased food products, but they found no useful fingerprints in the room. Police also tested a gold Mercedes Benz parked in front of Room 24, which belonged to Phillips's wife, for fingerprints, but came up with nothing useful. Detective Hill interviewed the resident of Room 21, who reported that she had heard a loud noise that sounded like a gunshot sometime after 10:00 p.m. the night before, but could not pinpoint the exact time.

Based on the state of the bodies when the medical examiner's investigator arrived at the scene, the medical examiner placed the time of death between 8:20 p.m. and

---

[2] We have considered each of defendant's other assignments of error and each of his supporting arguments. Those other assignments of error either have been discussed by this court in previous cases and resolved against defendant, were not preserved for review, or are not well taken. Further discussion of the issues would not benefit defendant, the public, the bench, or the bar.

10:20 p.m. on November 2, 1991. The medical examiner performed autopsies on both Phillips and Flannigan on November 4. Based on the partially digested food in Phillips's stomach, combined with information concerning the time that Phillips last had eaten, the medical examiner concluded that Phillips had died between 8:20 p.m. and 10:20 p.m. on November 2. The medical examiner was unable to use the undigested food in Flannigan's stomach to assess her time of death, because the medical examiner had no information about when she last had eaten.

According to the record of outgoing telephone calls from the Ara'Bel Motel, the occupants of Room 23 made two 9-1-1 calls in the early morning hours of November 3, 1991. The first had occurred at 2:55 a.m. and the second had occurred at 2:58 a.m. Olivia and Paul Gattermeir were registered to Room 23, and each of them had called 9-1-1 to report "pops" that sounded like gunfire coming from the room next door. Detective Hill obtained a tape recording of the 9-1-1 calls and later interviewed Olivia about her call. Hill memorialized the content of that interview in a written report on November 7, 1991. That report recounts that Olivia told Hill that she and Paul had come back from dinner between 8:00 p.m. and 10:00 p.m. on November 2 and that they had heard loud "pops" approximately 30 to 45 minutes after they returned from dinner, well before the first 9-1-1 call was placed. The recording of the 9-1-1 calls was missing at the time that defendant was indicted and never has been recovered.

Detective Hill interviewed defendant shortly after the murders and learned that he had met Flannigan sometime in October 1991 at the Five Spot Tavern (Five Spot), where she worked. At the time, defendant had been living with Foreman. Defendant and Flannigan began dating, and they eventually both moved into the apartment of Eddie Bynum, one of defendant's associates. According to defendant, six days before Flannigan's murder, Flannigan did not return to the apartment at the end of her shift.[3] Defendant later learned that Flannigan had resumed her relationship

---

[3] Registration records from the Ara'Bel Motel show that Flannigan checked into Room 24 on October 30, 1991, three days before her murder.

with her ex-boyfriend, Phillips. Flannigan returned to Bynum's apartment three days later to retrieve her clothing. Defendant, who was at the apartment when Flannigan returned, told her that she could get her clothes when she repaid $500 that she owed him. They argued about the debt, and Flannigan left on foot without her clothing.

According to defendant's interview with Hill, on the morning following the argument, Flannigan had called defendant at Bynum's apartment and informed him that she needed her clothing. She arrived at the apartment early that afternoon in a Toyota that, according to defendant, she said Phillips had bought for her. Defendant said that they talked for a little while, that Flannigan retrieved some of her clothing, and that she then left for work. Later that night, defendant went to the Five Spot to speak with Flannigan again.

Defendant further told Hill that Flannigan had called him at about 4:00 a.m. on November 2, 1991, (the day of the murders) and that he and Flannigan had spoken for approximately three hours. Between noon and 1:00 p.m. that day, Flannigan went to see defendant at Bynum's apartment. They apparently drove to a park, but Flannigan's car broke down. Flannigan had to get to work that evening, so they called Bynum and asked him for a ride. Bynum picked them up and dropped Flannigan off at the Ara'Bel Motel.

Defendant told Hill that he and Bynum had planned that night to go to a friend's house to watch a local professional basketball game on television, but that he decided to go home instead. Bynum dropped him off at their apartment between 6:30 p.m. and 6:45 p.m. Defendant said that Bynum had called him at the apartment during halftime, between 8:00 p.m. and 8:30 p.m., to tell him that he wasn't missing anything because the cable TV connection had gone out. Defendant said that, between 10:00 p.m. and 10:30 p.m., he drove one of Bynum's cars to a Safeway store, bought beer and a pack of cigarettes, and returned to the apartment. When defendant returned, Bynum was there. A short time later, Foreman arrived at the apartment with a friend. Foreman, his friend, and defendant then went to the New York Diner, a nightclub. According to defendant, they remained there until closing, which was about 2:30 a.m. They

then tried to eat at a Lyon's restaurant and then at a Denny's restaurant, but the restaurants were too crowded. According to defendant, he returned to Bynum's apartment between 3:00 a.m. and 4:00 a.m. on November 3.

Bynum's statements to Hill were consistent with defendant's statements. He confirmed that he and defendant had dropped Flannigan off at the Ara'Bel Motel between 6:00 p.m. and 6:30 p.m. on November 2. Bynum also confirmed that he had telephoned defendant at the apartment during halftime of the basketball game, which was sometime between 8:00 p.m. and 8:30 p.m. Bynum further stated that, when he returned home between 10:15 p.m. and 10:30 p.m., defendant was not at the apartment and had taken one of Bynum's cars without permission. Bynum called Foreman to ask about defendant's whereabouts, but, as he did, defendant walked in carrying a 40-ounce bottle of beer.

Detective Hill interviewed Foreman on November 6, 1991. Foreman stated that, on November 2, 1991, he and two friends—Josh Lowery and Erik Payne—had planned to go to the basketball game at halftime and watch it in the arena. Foreman told Hill that, when they could not get into the game, they went to the Five Spot between 9:00 p.m. and 9:15 p.m., where Flannigan was dancing. Foreman and his friends left the Five Spot soon after Flannigan finished her shift, around 9:30 p.m. and 9:45 p.m., and went to a Safeway store and then to a 7-Eleven store. After that, they dropped Payne off at the University of Portland, went to a McDonald's, and then went to Bynum's apartment sometime between 10:30 p.m. and 11:30 p.m. to pick up defendant. Foreman stated that the group, including defendant, then went to the New York Diner and remained there until it closed at about 2:30 a.m. Foreman told Hill that, after leaving the New York Diner, they attempted to eat at Lyon's and then at Denny's, but the restaurants were too crowded. Foreman stated that they took defendant back to Bynum's apartment between 4:00 a.m. and 4:30 a.m. on November 3, 1991.

Following up on Foreman's story, Detective Hill interviewed Lowery on November 8, 1991. Lowery's description of events was consistent with Foreman's description,

including that they had picked up defendant at Bynum's apartment between 10:30 p.m. and 11:00 p.m. on November 2 and that they were with him until they dropped him off at the apartment at around 4:00 a.m. on November 3. On several occasions, Detective Hill attempted to contact Payne for an interview, but could not locate him.

On November 12, 1991, Detective Norman interviewed Gary Cline, a regular patron of the Five Spot, who knew defendant and Flannigan. Cline informed Norman that, on the evening of October 31, 1991, two days before Flannigan's death, he had seen defendant and Flannigan arguing in the parking lot. During that argument, Flannigan told defendant that she did not want to see him anymore and that she did not want him to visit her at the Five Spot. According to Cline, defendant was visibly upset after hearing that information. Cline walked up to the couple, but defendant told Cline to go back inside and said that he would talk to him later. Cline went back inside.

Cline informed Norman that he knew that defendant and Flannigan had been arguing during the prior week, that Flannigan was breaking off her relationship with defendant, and that Flannigan had told a bartender that she did not want defendant at the Five Spot anymore. Cline had also heard that Flannigan was breaking up with defendant to get back together with her old boyfriend, Phillips. Cline further informed Norman that, after defendant had argued with Flannigan, he was "moping around" over Flannigan ending their relationship. Cline told defendant that dancers like Flannigan were not worth it and to not worry about it anymore. Cline told Norman that he had said to defendant, "Come out here, I'm gonna beat your ass if you don't wise up." Cline then started to walk out the door and defendant followed. As they continued outside, Cline heard defendant slide the hammer back on a pistol and then ask, "You know what that is?" Cline replied that it sounded like a .45 caliber pistol. "You're right," defendant confirmed. When they got just outside the door and into the parking lot, defendant showed the pistol to Cline, who then said, "It's a good thing it isn't loaded." Defendant ejected a cartridge out of the weapon, which landed on the ground near the door, and said, "Well, it is." Cline replied, "It's a good thing we're friends."

Defendant then tucked the gun into his belt behind his back, and he and Cline went back inside.[4] Cline told Norman that he knew that defendant's pistol was a .45 caliber because he had spent time in the military where he had seen .45 caliber automatic pistols.

Based largely on Cline's statements, Norman obtained a warrant to search defendant's person, Foreman's residence (where defendant then resided)[5] and Foreman's SUV, the vehicle in which Foreman generally drove defendant around. On November 25, 1991, Norman and seven other officers spent an hour and a half searching those three areas for a .45 caliber weapon, associated ammunition, and other items. The search was unsuccessful, however, and the officers did not seize any evidence.

The investigation of the case stalled. Then, in late 1996, a person named Sammy Grihm, who apparently was facing unrelated criminal charges, disclosed information to police about defendant's involvement in the murders.[6] Grihm had been staying in Portland with his sister, Tina Spann, who was in a sporadic relationship with defendant and had lived with him for several years in the mid-1990s. Grihm told detectives that he had overheard two conversations in which defendant and Spann talked about Flannigan and Phillips, and that defendant had admitted killing them.

Specifically, according to Grihm, in the first conversation, Spann had said to defendant something to the effect of, "I know you killed those two people," and defendant replied "yeah," confirming that he had. Grihm further reported that defendant had said that the two victims just

---

[4] According to Cline, defendant did not pick up the cartridge after their exchange in the parking lot of the Five Spot. At the pretrial hearing on defendant's motion to dismiss for preindictment delay, Norman testified that he did not go to the tavern to look for it after interviewing Cline during the investigation of the case in November 1991. Norman admitted that the cartridge would have been a probative piece of evidence, especially if its numbers, manufacturer, and ejection pattern matched those of the casings found in Room 24.

[5] In a subsequent conversation with Detective Hill on November 11, 1991, Bynum likewise told Hill that defendant, after breaking up with Flannigan, had moved out of Bynum's apartment and back in with Foreman.

[6] In 1996, Detective Hill was killed in a plane crash while on vacation. Other detectives therefore took over the investigation.

had returned from the store and that Flannigan had wine and food "all laid out." Defendant also said that, initially, he was not going to shoot "the punk," referring to Phillips, but when Phillips came at him, defendant shot him. Defendant said that he then slapped Flannigan and, afterwards, shot her twice in the head. Grihm told the detectives that he later spoke with Spann about defendant's statements and that she confirmed that defendant had killed two people. She told Grihm that the murders had taken place at the Courtesy Inn.[7]

The second conversation, in which Grihm had heard defendant admit to killing Flannigan, was shorter. Grihm heard defendant order Spann to come into the bedroom, and Spann replied something to the effect of, "I better, or you'll kill me like you did that bitch." Defendant replied: "Yeah, I shot that bitch two times, I ain't going to lie, yeah, I did it, I did it, period[.]"

After Grihm related those conversations to the detectives, the detectives interviewed Spann. Spann did not back up Grihm's statements. Spann agreed to a polygraph examination, but the results were inconclusive. Ultimately, the detectives were unsure who to believe, but they suspected that Grihm was not being truthful and was embellishing.

At that point, the investigation of the case stalled again. The next break in the case did not come until April 2002. At that time, detectives learned from an inmate in the Oregon State Penitentiary that defendant had admitted to another inmate, Ronald Teal, that he had killed Flannigan and Phillips. Detectives interviewed Teal on May 17, 2002. Teal informed the detectives that he had been defendant's weightlifting partner when they were in prison together. Teal said that defendant had told him that Flannigan had stolen $70,000 from Bynum and had purchased a Mercedes Benz for Phillips. According to Teal, defendant characterized himself as a hit man for "Fast Eddie," referring to Bynum, and defendant described in detail how he had murdered Flannigan and Phillips. After interviewing Teal, detectives

---

[7] Sometime after the murders, the Ara'Bel Motel was renamed the Courtesy Inn.

interviewed defendant again to determine whether he stood by the original statements that he had made in 1991 to Detective Hill. To that end, Detective Winn went line by line through Hill's report of defendant's interview, and defendant confirmed that his statements in that report were correct.

Detectives also contacted Bynum, who was then under indictment for drug trafficking. They interviewed him on June 5, 2002. Initially, Bynum confirmed the statements that he had made to detectives in 1991. The next day, however, Bynum and his attorney met with detectives to negotiate a deal in which the state would agree to a reduction in Bynum's sentence on the drug trafficking charge in exchange for his participation in the case against defendant for the murders of Flannigan and Phillips. At that meeting, Bynum changed his story in one regard: he reported that he could not remember whether he had telephoned defendant during half-time of the basketball game. Thus, Bynum no longer corroborated defendant's whereabouts from 8:00 p.m. to 8:30 p.m. on the night of the murders. Bynum otherwise confirmed the accuracy of his original statements. Bynum added, however, that, after the 1991 interview with detectives, he asked defendant whether he had killed Flannigan and Phillips and defendant said, "Yeah, I killed them, Cuz." Bynum further reported that defendant had made a reference to the fact that Bynum's family could be killed as easily as Flannigan and Phillips were killed. Bynum interpreted that comment as a threat.

On July 8, 2002, detectives interviewed another inmate, George Modaff, who had been part of defendant's weightlifting circle in prison. Modaff confirmed that Teal was defendant's regular workout partner and that defendant and Teal were very close. Modaff further informed detectives that, on one occasion, defendant had talked about having problems with a black pimp and a white girl, referring to Phillips and Flannigan, and told Modaff that, "I got them motherfuckers." Modaff learned from defendant that both victims had been shot. Modaff also reported that their weightlifting circle grew to include Stanley Ford and Eddie Lee Davis. Modaff asked defendant why he had let Ford and Davis join the group, and defendant replied something to the effect of, "You keep your friends close, and your enemies even

closer." Modaff asked defendant what he meant by that, and defendant explained that he had killed a member of Davis's family. Investigators later confirmed that Phillips was related to Eddie Lee Davis.

In light of those new developments, Detective Winn renewed efforts to track down Payne, who had been with defendant on the night of the murders, but whom Detective Hill could not locate for an interview in 1991. Winn discovered that Payne was in Helsinki, Finland, and interviewed him over the telephone on October 25, 2002. Payne informed the detective that, on the night of the murders, he had been in Foreman's SUV with Lowery, defendant, and a fifth person, whom he could not remember, and that Foreman had been driving. Payne stated that defendant had been extremely angry and upset over $500 that Flannigan had stolen from him and used to buy a car for another man. According to Payne, while defendant was "ranting and raving" about how he was going to kill Flannigan, he was loading a .45 caliber pistol and telling the others in the vehicle that, once they dropped him off at "ya'll know where," they had better "get some place to be seen" within the next 45 minutes to establish an alibi. Payne remembered that Foreman and Lowery tried to talk defendant out of killing Flannigan. After failing in that effort, they dropped defendant off between 9:00 p.m. and 10:00 p.m. at a motel where, as Payne was aware, Flannigan was known for taking men. Payne also remembered that defendant wanted to be dropped off within that time frame because Flannigan would finish her shift at the Five Spot around then. Payne told the detective that, once they arrived at the motel, only defendant got out of the car.

Payne said that he remembered the events of that night because he rarely had seen anyone that upset before and the images of defendant raging about how he was going to kill Flannigan, while loading the gun and talking about having 45 minutes to get away, stuck in his mind. Payne was so convinced that defendant would actually go through with killing Flannigan that he demanded to be taken back to his dormitory at the University of Portland after defendant was dropped off at the motel. Finally, Payne told the detective that, shortly after he had learned about the murders in the

news, Foreman called him and then handed the telephone to defendant, who threatened to kill Payne if he talked to the police. Payne explained that, after that call, he avoided any contact with the police.

Payne returned to Portland from Finland to testify before the grand jury on November 7, 2002. Also on that date, the prosecutor and detectives reinterviewed Lowery.[8] Lowery, in describing the events of November 2, 1991, revealed several details that he previously had not told police. Specifically, he said that, after failing to get into the basketball game at halftime, he and Foreman had met defendant in the parking lot of a bar across the street from the Ara'Bel Motel between 9:00 p.m. and 10:00 p.m. According to Lowery, defendant and Foreman talked briefly and then both were gone for up to 10 minutes. Lowery did not pay attention to where they went. When Foreman got back into the car, Foreman was "disco[m]bobulated and confused" and said, referring to defendant, "Fuck [defendant], let him do whatever he's going to do. We're out of here."

According to Lowery, they then drove to the University of Portland without defendant, dropped Payne off at his dormitory, and went to the New York Diner. While they were there, defendant called Foreman on his cell phone, and they left to pick him up at Bynum's apartment. On the way, Foreman told Lowery that defendant had just killed two people. They picked up defendant and returned to the New York Diner, where they stayed until closing. After looking for some place to eat, they took defendant back to Bynum's apartment. Lowery also told detectives that, after police initially interviewed defendant about the murders in 1991, Lowery and Foreman constructed an alibi and agreed to tell police the truth about everything that had happened that night, but to leave out the trip to the parking lot across from the Ara'Bel Motel. Lowery said that defendant later thanked

---

[8] Lowery's interview on November 7, 2002, the day of the grand jury hearing, was not recorded. After testifying before the grand jury, Lowery left Portland, but he returned on January 28, 2003, to be interviewed again. Detective Winn was present at both interviews. At defendant's pretrial hearing, based on his recollection of those interviews, Winn testified about Lowery's statements. Thus, Lowery's statements, as related in the record, consist in part of statements made to police after defendant had been indicted.

him for providing an alibi. Lowery, like Payne, also testified before the grand jury on November 7, 2002.[9]

The grand jury indicted defendant on November 8, 2002, on eight counts of aggravated murder with a firearm and four counts of aggravated felony murder with a firearm for the murders of Flannigan and Phillips. As explained in detail below, after lengthy pretrial proceedings, the case against defendant went to trial before a jury on October 11, 2005, and, on October 28, 2005. The jury found defendant guilty of all counts. Following a penalty-phase proceeding, the trial court sentenced defendant to death.

## II. DISCUSSION

As noted earlier, we address four of defendant's 14 assignments of error. First, we discuss whether preindictment delay required the trial court to grant defendant's motion to dismiss. Second, we address whether the trial court erred in denying defense counsel's motions to withdraw. Third, we discuss whether the prosecutor's reference in his opening statement to the expected testimony of a witness required a mistrial when the witness failed to appear for trial. Finally, we address defendant's claim that the trial court erred in refusing to admit evidence of the contents of a police report.

### A. *Preindictment Delay*

██ In his first assignment of error, defendant argues that the trial court erred in denying his motion to dismiss for preindictment delay. This court has not identified expressly what standard of review applies to the denial of a motion to dismiss for preindictment delay. Both parties take the position that this court reviews the trial court's ruling for errors of law. We agree with that standard. Additionally, to the extent that the trial court resolved disputed factual issues in making its ruling, we will not disturb the trial court's express

---

[9] In addition to the individuals described in the text, detectives also interviewed several other people who had either come into contact with defendant over the years and to whom defendant admitted, in varying degrees of detail, that he had committed the murders or had heard through others that defendant had committed the murders.

or implicit factual findings as long as those findings are supported by the evidence. *See Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968) (stating that standard).

██ ██     Before trial, defendant moved to dismiss the indictment on the ground that the 11-year period between the date of the murders and the date of his indictment violated his right to due process under the Fifth and Fourteenth Amendments to the United States Constitution.[10] In support of his motion, defendant urged that the state "may have acted to gain tactical advantage" or otherwise improperly delayed in indicting him. Defendant further urged that the delay resulted in actual prejudice to his ability to mount an effective defense. In support of his claim of prejudice, defendant identified several items of potential evidence that were no longer available to him. Those evidentiary items fell into two categories: (1) items procured by the police in 1991 that now are missing; and (2) items or information that defendant claimed should or could have been obtained through diligent investigation, but were not, and are no longer available.

Following an extensive pretrial hearing, the trial court made detailed findings of fact about the prosecution's investigatory efforts during the 11-year period between the murders and the indictment. After making those findings, the trial court identified the legal standard that it believed applied to defendant's motion and concluded that defendant had failed to make the showing necessary for dismissal of the charges against him based on prosecutorial delay:

"I believe the standard is substantial prejudice and that the delay, in effect, either by * * * negligence, recklessness,

---

[10] In the trial court, defendant also argued for dismissal on the theory that the state's delay in indicting him violated his rights to a speedy trial under both Article I, section 10, of the Oregon Constitution, and under the Sixth Amendment to the United States Constitution. On review, defendant acknowledges that, for purposes of both the state and federal speedy trial guarantees, "the time elapsing prior to an arrest or a formal charge is not taken into consideration in determining whether a defendant has been given a speedy trial." *State v. Serrell*, 265 Or 216, 219, 507 P2d 1405 (1973); *see also United States v. Marion*, 404 US 307, 313, 92 S Ct 455, 30 L Ed 2d 468 (1971) ("[i]n our view, however, the Sixth Amendment speedy trial provision has no application until the putative defendant in some way becomes an 'accused,'" which occurs after indictment). In this case, defendant's claim is predicated only on delay that occurred before his arrest and indictment. In his brief to this court, defendant presses only his federal due process argument.

or intent[,] had the purpose of being a tactical advantage. * * *

"In this particular case, having factually found what I have found, and recognizing that eleven years is a hugely long time, I am going to deny the motion to dismiss. First of all, I cannot even find negligence here. There was a conspiracy of circumstances that was really kind of tragic.

"I draw a distinction between things that one could argue in retrospect should have been done or might have been done in an investigation. Those are issues of weight to be given to the investigation when and if the case proceeds to trial and witnesses are cross-examined.

"I find that due to the solidity of [defendant's] and Mr. Foreman's alibis[.] * * * Everyone's statements fell together and held together. I don't see that the police had an obligation to investigate in the sense that [defendant] has suggested[.] * * *

"At that point in time until '96 when Detective Hill was killed nothing really developed, and it was not until 2002 that people's stories started to change; that witnesses came forward whose motives I will not comment on. That's a—a fact finder at trial issue.

"But it was not until then that there was any hint other than that of a broken relationship that would have suggested [defendant] was, in fact, the person who had committed the murders.

"I'm sure people suspected it, but the time frames being what they were known to be, there was no reason, no basis, really, upon which the State could have said in good faith that they could have at that time proved that [defendant] was the person who committed the homicides beyond a reasonable doubt.

"So I would not find that the delay was intentional or reckless or negligent. Substantial prejudice means significant. It means that somehow or another the ability of [defendant] to defend himself has been compromised through no fault of his own in a way that makes it virtually impossible to defend himself.

"The only thing in this case that is different from what happens in many cases in terms of quality of investigation is that the passage of time has caused the loss of the 911

tape. We do know the time. We do have interviews with the caller, and the caller's companion.[11]

"I could not find that that, the absence of supporting evidence other than the testimony of other witnesses of [defendant's] alibi[,] [t]he not seizing things from Room 24 in the Ara'Bel of which we have pictures, and the testimony of criminalists, constitutes a substantial prejudice to [defendant]."

As the quoted material shows, the trial court specifically found that the state's delay in indicting defendant was not intentional, reckless, or negligent. Instead, the trial court found that the delay was due to the state's reasonable efforts to investigate the case and to obtain sufficient evidence to bring charges. In addition, the trial court concluded that defendant had not been substantially prejudiced in his defense of the case.[12]

After making those findings and conclusions, the trial court asked if either party wanted further factual findings on any issues bearing on the motion to dismiss. The state requested that the court make a finding as to when probable cause existed to believe that defendant had committed the murders. On that issue, and based on the evidence adduced at the hearing, the state submitted that probable cause did not exist until the summer of 2002. The trial court agreed and affirmatively found that probable cause developed between April and June of 2002, when police reinterviewed Bynum, Lowery, Davis, and Foreman. The trial court further explained that the "real break" in the state's case came in

---

[11] Defendant's investigator interviewed both Paul and Olivia Gattermeir in August and September 2003, respectively, concerning their observation of the events at the Ara'Bel Motel, including their placement of the 9-1-1 calls. Both interviews were recorded and admitted into evidence at the pretrial hearing on defendant's motion to dismiss.

[12] Defendant urges that the trial court applied a legal test for prejudice that placed too great a burden on defendant, by requiring defendant to show that it was "virtually impossible to defend himself." If that were the legal standard that the trial court applied, we would agree that was incorrect. When the trial court's comments about the legal standard are considered *in toto*, however, we understand the trial court to have followed the substantial and actual prejudice standard articulated by federal courts. In all events, although we defer to the trial court's findings of historical fact, an assessment of prejudice is, in the end, a legal question. Later in this opinion, we analyze defendant's claim of prejudice without deference to the trial court's recital of the legal standard.

April 2002, when the state learned that defendant had admitted committing the murders to Teal. After making those additional findings, the trial court denied defendant's motion to dismiss for preindictment delay.

On review in this court, the parties' fundamental dispute is over the legal test that applies to determine when preindictment delay rises to the level of a federal due process violation. In that regard, the parties agree that the test has two prongs: substantial prejudice and the reasons for the delay. The parties disagree, however, whether a defendant must show that the government intentionally delayed in indicting the defendant for an impermissible purpose, such as to obtain a tactical advantage. Citing *U.S. v. Barken*, 412 F3d 1131, 1134 (9th Cir 2005), which represents a minority view among the federal circuit courts, defendant argues that intentional misconduct is not a necessary element of the test. Instead, defendant urges, the correct analysis requires balancing the reasons for the delay against any actual prejudice to defendant to determine whether the delay "offends those fundamental conceptions of justice which lie at the base of our civil and political institutions." *Id.* (internal quotes and citations omitted); *see also Jones v. Angelone*, 94 F3d 900, 905 (4th Cir 1996) (following similar test). The state, on the other hand, relies on the majority view among the lower federal courts, which requires a defendant who can demonstrate actual prejudice to his defense to further show that the government intentionally delayed to gain a tactical advantage or to advance some other improper purpose. *See, e.g., U.S. v. Crouch*, 84 F3d 1497, 1511-12 (5th Cir 1996), *cert den*, 519 US 1076 (1997) (citing cases and discussing rationale for adopting the legal test endorsed by a majority of the federal circuit courts).

This court only once before has addressed a claimed due process violation based on preindictment delay. That occurred more than 30 years ago, in *State v. Serrell*, 265 Or 216, 507 P2d 1405 (1973). In that case, the defendant sold narcotics to an undercover agent and was indicted 141 days later. In seeking dismissal based on preindictment delay, the defendant argued that the state had all the information needed to indict him on the date of the crime and that he had been prejudiced by the delay in indicting him because he no longer could recall his whereabouts on the day of the sale. *Id.*

In resolving the defendant's due process claim, this court quoted the following passage from *United States v. Marion*, 404 US 307, 324-25, 92 S Ct 455, 30 L Ed 2d 468 (1971), which, at the time, was the lead United States Supreme Court decision on the constitutional significance of a lengthy preindictment delay:

"[I]t is appropriate to note here that the statute of limitations does not fully define the appellees' rights with respect to the events occurring prior to indictment. *Thus, the Government concedes that the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown at trial that the pre-indictment delay in this case caused substantial prejudice to appellees' rights to a fair trial and that the delay was an intentional device to gain tactical advantage over the accused.* However, we need not, and could not now, determine when and in what circumstances actual prejudice resulting from pre-accusation delays requires the dismissal of the prosecution. Actual prejudice to the defense of a criminal case may result from the shortest and most necessary delay; and no one suggests that every delay-caused detriment to a defendant's case should abort a criminal prosecution. To accommodate the sound administration of justice to the rights of the defendant to a fair trial will necessarily involve a delicate judgment based on the circumstances of each case. It would be unwise at this juncture to attempt to forecast our decision in such cases."

(Internal citations omitted; emphasis added.) After quoting from *Marion*, this court in *Serrell* declared that, "[i]n any event," the defendant's only assertion of prejudice (his inability to recall his whereabouts on the date of the offense) was inadequate to carry his burden to demonstrate substantial prejudice to his defense. *Serrell*, 265 Or at 220.

As the Supreme Court in *Marion* described, the government conceded in that case that an intentional delay for purposes of securing a tactical advantage would suffice. The Court implicitly accepted that concession, but ultimately went on to decide the case based on the defendants' failure to establish actual prejudice due to the delay.[13] Likewise, in

---

[13] In *Marion*, three years had elapsed between when the government became aware of the alleged criminal acts and the filing of the indictment. *Marion*, 404 US at 308. The defendants moved to dismiss, because, they asserted, the delay was due to the government's negligence or indifference in investigating the case. *Id.* at 310.

*Serrell*, this court implicitly accepted the proposition that intentional delay to secure a tactical advantage would satisfy the reasons-for-the-delay prong of the test. As in *Marion*, however, the defendant in *Serrell* did not make an adequate showing of actual prejudice, and this court resolved defendant's claim against him for that reason. Thus, neither *Marion* nor *Serrell* resolved, one way or the other, whether a due process violation can arise when excessive delay in indicting a defendant is due to something other than intentional prosecutorial misconduct. Indeed, in *Marion*, the Supreme Court expressly reserved the question of "when and in what circumstances actual prejudice resulting from pre-accusation delays requires the dismissal of the prosecution[,]" reasoning that it would be "unwise" to attempt to forecast its decision based on the limited record and the single case before it. 404 US at 324-25.

A few years after *Marion* and *Serrell* were decided, the Supreme Court in *United States v. Lovasco*, 431 US 783, 796-97, 97 S Ct 2044, 52 L Ed 2d 752 (1977), again deferred the issue: "[N]either this Court nor any lower court has had a sustained opportunity to consider the constitutional significance of various reasons for delay." The Court therefore declared that it would "leave to the lower courts, in the first instance, the task of applying the settled principle[ ]" that controls the inquiry—*viz.*, that due process affords protection "only" for violations of "those 'fundamental conceptions of justice which lie at the base of our civil and political institutions[.]' " *Id.* at 790, 797. As already noted, since *Serrell*, this court has not again addressed a due process claim based on preindictment delay. This court therefore has not addressed whether reasons for preindictment delay, other than an intentional delay to obtain a tactical advantage, may rise to

The district court dismissed the indictment after concluding that the government must have been aware of the relevant facts soon after the occurrence of the acts and that there must have been prejudice due to the three-year delay. *Id.* The Supreme Court rejected the defendants' Sixth Amendment speedy trial argument, and then turned to the defendants' argument under the Due Process Clause. *Id.* at 313-23. Ultimately, the Court held that the defendants failed to demonstrate that the preindictment delay violated the Due Process Clause: "No actual prejudice to the conduct of the defense is alleged or proved, and there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them." *Id.* at 325.

the level of a due process violation. Neither has the Supreme Court done so.

The lower federal courts have engaged that task, however, and, as noted, have split into two camps. The majority requires a showing that the government intentionally delayed in indicting a defendant either to gain a tactical advantage or for some equally impermissible purpose. *See, e.g., Crouch*, 84 F3d at 1511 (discussing majority view). The minority view—endorsed by only the Fourth and Ninth Circuits—applies a "more lenient" and open-ended balancing test to determine if the delay "offends those fundamental conceptions of justice which lie at the base of our civil and political institutions." *Barken*, 412 F3d at 1134 (internal quotation marks and citations omitted); *Angelone*, 94 F3d at 905 (describing minority test as "more lenient" and adhering to that test). Under the minority view, it is less clear what reasons will make out a due process violation. In part, the answer depends on the extent to which a defendant has been prejudiced, because that determines "where the fulcrum for the balancing is to be placed." *United States v. Mays*, 549 F2d 670, 678 (9th Cir 1977). Intent, recklessness, and even negligence may suffice. *United States v. Moran*, 759 F2d 777, 781-82 (9th Cir 1985), *cert den*, 474 US 1102 (1985). As the Ninth Circuit has explained:

> "The greater the length of the delay and the more substantial the actual prejudice to the defendant becomes, the greater the reasonableness and the necessity for the delay will have to be to balance out the prejudice. However, despite the degree of actual prejudice, for a judgment in favor of dismissal, there must be some culpability on the government's part either in the form of intentional misconduct or negligence."

*Mays*, 549 F2d at 678 (citations omitted). Although that split of lower federal court authority has been in place for many years, the United States Supreme Court thus far has declined to resolve it. *See Hoo v. United States*, 484 US 1035, 1035-36, 108 S Ct 742, 98 L Ed 2d 777 (1988) (White, J., dissenting from denial of certiorari) (acknowledging the "significant disagreement in the lower courts over the proper test"

572

and stating that he would grant certiorari to resolve the "continuing conflict among the Circuits on this important question of constitutional law").

Given that legal landscape, our task ordinarily would be to make our best prediction of the federal test that the Supreme Court would endorse, based on that Court's precedents and our informed understanding of the due process principle involved. Making that prediction is complicated by the fact that, as one court has aptly observed, the Supreme Court's opinions in *Marion* and *Lovasco* each "contains some language that can give comfort" to both the majority and minority lower federal court views. *Crouch*, 84 F3d at 1510. The majority view, by requiring intentional delay for an improper purpose, such as to gain a tactical advantage, sets the bar high. But doing so is consistent with the Court's admonition that statutes of limitation provide the primary protection against stale prosecutions and that the Due Process Clause has "a limited role" to play in protecting a defendant from excessive preindictment delay. *Lovasco*, 431 US at 789; *see Marion*, 404 US at 323-24 (describing statutes of limitations as the primary protection provided by law for prejudice resulting from the passage of time between crime and arrest or charge). On the other hand, the "more lenient" balancing test embraced by the minority view is consistent with the Court's unwillingness to declare that only intentional delay violates due process, and its invitation to lower courts to assess on a case-by-case basis the wide-ranging circumstances that preindictment delays may involve. *Lovasco*, 431 US at 796-97; *Marion*, 404 US at 324-25.[14]

---

[14] Since *Marion* and *Lovasco* were decided, the Supreme Court has characterized those cases as requiring a defendant, in establishing a due process violation for preindictment delay, to prove a heightened level of culpability on the government's part as the reason for its delay in bringing charges against a defendant. *See United States v. Gouveia*, 467 US 180, 192, 104 S Ct 2292, 81 L Ed 2d 146 (1984) (a defendant must "prove that the Government's delay in bringing the indictment was a deliberate device to gain an advantage over him and that it caused him actual prejudice in presenting his defense"); *see also United States v. $8,850*, 461 US 555, 563, 103 S Ct 2005, 76 L Ed 2d 143 (1983) (a due process claim based on preindictment delay can prevail only if the defendant shows "that the Government delayed seeking an indictment in a deliberate attempt to gain an unfair tactical advantage over the defendant or in reckless disregard of its probable prejudicial impact upon the defendant's ability to defend against the charges"). The Court has done so, however, only in *dicta*. Meanwhile, the Court has continued to decline review of cases in which it could resolve the split in the lower federal courts. *See, e.g., Hoo*, 484 US

We conclude, however, that this case does not require us to predict what test the Supreme Court is likely to endorse. Under either test adopted by the lower federal courts, as well as any middle-ground test between them, defendant cannot succeed on his claim of a due process violation.

As defendant effectively concedes, the record contains no evidence that the state intentionally delayed in indicting defendant for an impermissible purpose, such as to gain a tactical advantage. Even if the evidence on that score were disputed—and it is not—the trial court's factual findings defeat any conclusion that the state intentially delayed for reasons amounting to prosecutorial misconduct. Defendant's due process claim therefore fails under the majority test, regardless of whether he suffered actual prejudice. *See Crouch*, 84 F3d at 1511 (due process violation based on preindictment delay requires a showing of bad faith or improper purpose on the government's part).

Defendant runs into equal difficulty under the minority "balancing" test that he invites us to adopt. As we have described, that test is more open-ended than the majority test in terms of the reasons for delay that a court may consider. But the prejudice inquiry under the two tests is equally exacting. A defendant must prove that he or she suffered "actual, non-speculative prejudice" from the delay by showing "exactly how the loss of evidence or witnesses was prejudicial." *Barken*, 412 F3d at 1134 (citations and quotes omitted). Defendant's showing of prejudice in this case falls short of that standard.

As we described earlier, defendant's claim of substantial prejudice is based on two groups of potential items of evidence that are no longer available: (1) items procured by the police in 1991 that are now missing; and (2) items or information that should or could have been obtained through diligent investigation but were not, and no longer can be obtained. Taking the second category of items first, defendant's list of unavailable items or information that police

at 1035-36 (White, J., dissenting from denial of certiorari). We therefore find no guidance in the Court's later characterizations of its holding in *Lovasco* and *Marion*.

failed to investigate or collect includes (1) bullet trajectories from Room 24; (2) trace evidence from the crime scene and the cars driven by defendant and Foreman; (3) fingerprints on shell casings found at the scene; (4) interviews of the motel guests who occupied rooms near Room 24; (5) the cartridge of ammunition that Cline had told detectives defendant had ejected onto the ground near the Five Spot; (6) the clothing that defendant had worn on the evening of November 2, 1991; and (7) interviews of Safeway personnel where defendant stated that he had purchased beer and cigarettes. Defendant also faults the state for failing to interview or otherwise investigate other people who may have had motives to kill Flannigan or Phillips.

Much, if not all, of that evidence, however, likely became unavailable weeks or months after the crimes were committed. Thus, the disappearance or dissipation of that evidence was a result of investigatory steps not taken, rather than delay *qua* delay in bringing the indictment. Accurately characterized, defendant's claim seems to be directed to the state's failure to collect or preserve potentially useful evidence. Such a claim—commonly referred to as "negligent investigation"—would require a showing of bad faith on the state's part before a due process violation would arise, which defendant does not assert. *See Arizona v. Youngblood,* 488 US 51, 57-58, 109 S Ct 333, 102 L Ed 2d 281 (1988) (so holding).[15]

In all events, even assuming that any of the items or information that defendant lists became unavailable because of the 11-year charging delay, defendant's claim of prejudice based on the unavailability of those items and information is purely speculative. For example, defendant speculates that the Safeway clerk might have provided testimony that could have exonerated defendant. Defendant similarly speculates that inhabitants of the Ara'Bel on the night of the murders might have testified consistently with defendant's theory. The same is true of the items of evidence that police did not

---

[15] Thus, to the extent that defendant's claim is more properly characterized as one based on inadequacies in the state's investigation rather than the delay in that investigation, he cannot have the benefit of the more open-ended balancing test used by a minority of circuits for claims of preindictment delay.

pursue in their investigation—such as defendant's clothing, bullet trajectories, trace evidence in the cars, and so on. Those potential witnesses and possible items of evidence might have shed light on the case, and the light they shed might have been favorable to defendant. Or they might have had no evidentiary value, or they might have bolstered the case against defendant. Any conclusion requires speculation. Defendant therefore is left to contend that "[b]ecause the record demonstrates that the state could have discovered and preserved that evidence in the exercise of reasonable diligence, the loss of the evidence *should be presumed* to be prejudicial to defendant's ability to present an effective defense." (Emphasis added.) *Marion* and *Serrell*, however, both require that a defendant show actual, not presumed, substantial prejudice. *Marion*, 404 US at 324-25; *Serrell*, 265 Or at 219-20. Simply identifying items and information of undetermined evidentiary value that the police theoretically could have obtained does not satisfy defendant's burden to demonstrate actual prejudice.

As to the first category of evidence (items that police had in their possession and later lost), defendant emphasizes the loss of the recording of the 9-1-1 calls that the Gattermeirs had made in the early morning hours of November 3, 1991. Defendant argues that the 9-1-1 recording would have "given rise to a reasonable inference that Flannigan was shot sometime after midnight, when defendant's whereabouts were accounted for." Defendant's theory is that the substance of the lost recording could support his claim that shots were fired around 3:00 a.m., the time of the 9-1-1 calls, when defendant has an undisputed alibi.[16]

The loss of the recording does not establish actual prejudice, because the asserted value of its contents is, again, entirely speculative. Defendant's theory requires the court to presume that, even though Phillips was murdered around

---

[16] Defendant does not claim that the lost 9-1-1 recording qualified as exculpatory Brady evidence, such that the loss would establish a violation of defendant's due process rights regardless of whether the state acted in good or bad faith. *See Brady v. Maryland*, 373 US 83, 87, 83 S Ct 1194, 10 L Ed 2d 215 (1963) (regardless of the government's good or bad faith, the government violates a defendant's due process rights if it does not disclose exculpatory evidence or fails to preserve evidence that might exonerate the defendant).

10:00 p.m., as the autopsy concluded, Flannigan was not murdered until shortly before 3:00 a.m., about 5 hours after Phillips's death. Whether the substance of the calls—as opposed to their timing—would support that theory is unknown. Nothing in the record, however, suggests that the contents would support defendant in that regard. To the contrary, Detective Hill interviewed Olivia Gattermeir shortly after the murders and summarized that interview in a report that was admitted for pretrial purposes. Detective Winn also testified about the substance of the 9-1-1 calls during the pretrial hearing on defendant's motion. According to that evidence, the Gattermeirs explained that the timing of their 9-1-1 calls did not coincide with when they had heard the "pops," and that, in fact, they heard the shots between 8:30 p.m. and 10:45 p.m. In addition, a defense investigator located and interviewed the Gattermeirs before trial, and both had recalled the events of that night. Apparently, both were available to testify at trial. Nothing in the record suggests that the content of the recording of 9-1-1 calls differed from anything that the Gattermeirs later told police or would have said if called to testify. Under those circumstances, and without some basis to believe that the contents of the lost recording would bolster defendant's theory, the unavailability of the 9-1-1 recording does not establish actual and substantial prejudice, as required under either the minority or majority federal tests for preindictment delay.

Even if the prejudice on which defendant relies is sufficient to be placed on the scale for purposes of the minority balancing test, it at most would weigh very lightly. That, in turn, would mean that the reasons for delay must weigh heavily in defendant's favor and against the state. *Mays*, 549 F2d at 678 (balancing test entails a sliding scale in which "the more substantial the actual prejudice to the defendant becomes, the greater the reasonableness and the necessity for the delay" must be). Here, however, as a matter of law, the reason for the state's delay in indicting defendant—*i.e.*, the need to sufficiently investigate the crimes and obtain probable cause to bring charges—does not tip the scales at all.

■ The Supreme Court has explained that the time necessary to in good faith investigate a crime—so-called "investigative delay"—is "fundamentally unlike delay undertaken

by the government solely 'to gain tactical advantage over the accused.' " *Lovasco*, 431 US at 795 (quoting *Marion*, 404 US at 324). Prosecutors do not deviate from fundamental conceptions of justice when they defer indictment until they have probable cause. *Id.* at 795-96. Neither are prosecutors obligated to seek an indictment as soon as probable cause exists. *Id.* Good faith investigative delay therefore does not deprive a defendant of due process, "even if [the] defense might have been somewhat prejudiced by the lapse of time." *Id.* at 796. The Ninth Circuit is in accord. Despite whatever showing of prejudice a defendant may make, good faith investigative delay does not violate due process. *Moran*, 759 F2d at 783 (investigative delay does not constitute a deprivation of due process, even when a defendant might have been somewhat prejudiced by the delay); *United States v. Walker*, 601 F2d 1051, 1055-57 (9th Cir 1979) (same). In other words, the Supreme Court may have left open the general question of the "constitutional significance of various reasons for delay" in bringing charges against a defendant, *Lovasco*, 431 US at 797, but it has foreclosed one—good faith efforts to investigate—as a basis for violating due process. *Id.* at 796.

Here, the trial court made extensive factual findings about the state's reason for delay, none of which defendant challenges, and all of which are supported by the record. The trial court expressly found that the charging delay in this case occurred because the investigation stalled in 1991, shortly after the murders, and then stalled again in 1996— each time due to defendant's skill in constructing an alibi. Significantly, the trial court further found that the state did not have probable cause until at least April 2002, shortly before defendant was indicted. That was the point at which police learned from Teal that defendant had made incriminating admissions while in prison. As the trial court emphasized, only then did several key witnesses change their stories. In particular, Bynum, Lowery, and Payne came forward with incriminating information in 2002 that they previously had withheld. Until then, defendant's and Foreman's accounts were consistent with information provided by Bynum and Lowery, creating a solid alibi for defendant.

From that evidence, the trial court described the lengthy delay as a "conspiracy of circumstances" caused by

"the solidity of [defendant's] and Mr. Foreman's alibis." The trial court specifically found that the state, in waiting until 2002 to indict defendant, did not act intentionally to gain a tactical advantage or otherwise act in bad faith. The trial court further found, expressly, that the state did not act negligently or recklessly. Those findings refute defendant's assertions that the state "passively permit[ted] evidence that it knows to be exculpatory to become unavailable due to the passage of time" and "simply stopped investigating for no apparent reason." In effect, the trial court's findings establish that the lengthy preindictment delay in defendant's case was the result of the state's good faith efforts to investigate the case and to gather needed evidence.

In sum, following either the majority or minority tests adopted by lower federal courts, the trial court properly denied the motion to dismiss based on defendant's claim of preindictment delay. Under the majority test, defendant had to show that the state intentionally delayed for an impermissible purpose, such as to gain a tactical advantage. Defendant neither attempted to nor made such a showing. Under both the majority and minority tests, defendant has failed to demonstrate actual and substantial prejudice to his ability to defend against the charges as a result of the delay. Finally, even if defendant arguably suffered some actual prejudice, the delay was for a constitutionally permissible reason: to investigate and obtain sufficient probable cause to bring charges. For those reasons, the trial court did not err.

B.   *Withdrawal of Counsel*

■         We turn next to defendant's challenge to the trial court's refusal to permit defendant's two trial counsel to withdraw from their representation of defendant. Defense counsel twice moved to withdraw, and each time the trial court denied the motions.[17] On review, defendant contends that the

---

[17] At approximately the same time that defense counsel made their motions to withdraw, defendant also moved for substitution of counsel. Defendant did so based on what he considered to be a breakdown in the attorney-client relationship that was so severe as to warrant new court-appointed counsel. On each motion, the trial court inquired into the reasons for defendant's dissatisfaction with his attorney and found them to be fairly nonspecific. To the extent that defendant identified particular reasons for seeking new counsel, the trial court found that defendant was dissatisfied with his counsel for reasons having to do with trial strategy and

trial court erred because the circumstances that counsel relied on in making their motions "*per se* establishe[d] a breakdown in the attorney-client relationship that is so severe that counsel [could not] provide adequate assistance of counsel." We review the trial court's rulings for abuse of discretion. *See State v. Langley*, 314 Or 247, 258, 839 P2d 692 (1992), *adh'd to on recons*, 318 Or 28, 861 P2d 1012 (1993) (court reviews denial of a motion for substitution of counsel for abuse of discretion).

■■        Defendant has a constitutionally guaranteed right to counsel under both Article I, section 11, of the Oregon Constitution and under the Sixth Amendment to the United States Constitution.[18] As we have observed, under both the state and federal guarantees, "the defendant's right is not just to a lawyer in name only, but to a lawyer who provides adequate assistance." *State v. Smith*, 339 Or 515, 526, 123 P3d 261 (2005). Thus, both provisions secure for a defendant "adequate performance by counsel of those functions of professional assistance which an accused person relies upon counsel to perform on his behalf." *Krummacher v. Gierloff*, 290 Or 867, 872, 627 P2d 458 (1981); *see also Strickland v. Washington*, 466 US 668, 686, 104 S Ct 2052, 80 L Ed 2d 674 (1984) (Sixth Amendment right to counsel requires not just counsel, but effective counsel). In *Strickland*, the Supreme Court emphasized the underlying purpose of requiring effective (which this court refers to as "adequate") counsel:

> "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the

counsel's frank assessment of the case against defendant and the strength of his defense. Those findings, which are supported by the record, defeat defendant's claim of error insofar as it is directed to the denial of his motions for substitute counsel. *See State v. Langley*, 314 Or 247, 258, 839 P2d 692 (1992), *adh'd to on recons*, 318 Or 28, 861 P2d 1012 (1993) ("A simple loss of confidence or disagreement with counsel's approach to matters of strategy is not cause to substitute one appointed lawyer for another."). We therefore reject defendant's assignments of error in that regard without further discussion.

[18] Article I, section 11, of the Oregon Constitution provides, in part:

"In all criminal prosecutions, the accused shall have the right to * * * be heard by himself and counsel."

The Sixth Amendment to the United States Constitution provides, in part:

"In all criminal prosecutions, the accused shall enjoy the right * * * to have the Assistance of Counsel for his defence."

> proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."

*Id.* Just as a defendant's motion for substitution implicates the constitutional guarantees of right to counsel, so too does a defense counsel's motion for withdrawal. Thus, the touchstone of the inquiry here is the same as for a motion for substitution—whether there has been a breakdown in the attorney-client relationship sufficient to establish an abridgement of the constitutional right to counsel. *See Langley,* 314 Or at 258 (articulating that constitutional standard for testing a denial of a motion for substitution of counsel); *see also Schell v. Witek,* 218 F3d 1017, 1026 (9th Cir 2000) (the ultimate constitutional question in reviewing a denial of a motion for substitute counsel is whether the conflict between the defendant and counsel became so great that it resulted in representation that fell below Sixth Amendment standards).

■      In this case, defense counsel first moved to withdraw about two weeks before trial, just before jury selection. In support of the motion, defense counsel represented to the trial court that defendant was totally unwilling to cooperate with any member of the defense team and that defendant's family was similarly uncooperative. Defense counsel expressed their concern that defendant's attitude had "seriously disabled [their] ability to provide effective assistance of counsel." In denying that first motion to withdraw, the trial court found that defense counsel were fully prepared for trial and were capable of adequately protecting defendant's interests. The court also found that defendant's lack of cooperation with his attorneys was deliberate and stemmed from defendant's unhappiness with defense counsel's frank assessment of the unfavorable evidence against defendant, which defense counsel had a duty to communicate to defendant.

A few weeks later, after the trial had begun, defense counsel renewed their motion to withdraw. They reported that defendant continued to disagree with counsel's decisions as to strategy and witnesses, and that those disagreements had resulted in "angry flare-ups" by defendant, including defendant's use of "racial epithets" toward his counsel. Counsel further represented that, in one conference with defendant, at least one of defendant's counsel feared for his personal safety. Counsel told the trial court:

"Your Honor, I understand the Court's reluctance to provide Mr. Davis with new counsel. However, I am strenuously requesting that the Court allow my withdrawal as counsel. I am completely and totally professionally compromised in terms of going any further for this man. He has given cause for me to feel concern for my own safety, concern for the safety of my co-counsel, concern for the negative implications that all of this would present to a jury in a case of this nature."

The trial court denied the second motion to withdraw. In so ruling, the trial court did not question the sincerity of counsel's concerns. Neither did the trial court doubt that the relationship between defendant and his counsel was strained. The trial court thought, however, that defendant was deliberately manipulating the attorney-client relationship in order to "throw a wrench in the trial simply where bad evidence has been coming in."[19] In addition, the trial court expressly found that defense counsel had been fully prepared and professional in their representation and had zealously, effectively, and professionally represented defendant throughout the case. In other words, although the strain between defendant and his counsel was real, that strain was not undermining counsel's actual representation of defendant.

On appeal, defendant does not take issue with the trial court's findings. He argues, however, that defense counsel's statement that they were afraid of defendant and felt "professionally compromised" is evidence *per se* of a serious breakdown in the attorney-client relationship, requiring the trial court to allow counsel to withdraw. We decline to adopt such a *per se* rule. The proper question to ask is whether,

---

[19] The two attorneys who represented defendant during trial were not the first attorneys appointed to represent him. Two other attorneys had previously been appointed to represent defendant, and defendant had successfully moved for their substitution based on an asserted breakdown in the attorney-client relationship. A third attorney was then appointed, and defendant also successfully moved for substitution of that counsel. The two counsel who represented defendant as the trial drew near, and who ultimately represented him through the trial proceedings, were the fourth and fifth attorneys so appointed. In expressing concern that defendant was deliberating undermining his relationship with his counsel, the trial court expressed its belief that defendant was doing so in response to the "mounting evidence against him."

given the circumstances involved, defense counsel adequately performed "those functions of professional assistance which an accused relies upon counsel to perform on his behalf." *Krummacher*, 290 Or at 872. In this case, the trial court found that defense counsel were fully adequate in their representation of defendant, despite the strain that defendant's hostility toward them created.

We note, moreover, that the trial court, in denying the motions to withdraw, did not foreclose defense counsel from again renewing their motions if, as the trial progressed, they found it impossible to represent defendant effectively. The issue did not arise again, however. The full record of the trial is before us, and we have reviewed it in its entirety. We have identified nothing on this record—and neither does defendant point to anything—to suggest that defense counsel's representation during the remainder of the trial became deficient or was so compromised that counsel were unable to represent defendant adequately. As we have said, we are unwilling to endorse the *per se* rule that defendant urges. Instead, the record affirmatively must reveal that counsel's ability to represent their client was in fact compromised, resulting in "an abridgment of a criminal defendant's constitutional right to counsel." *Langley*, 314 Or at 258. The record does not establish such an abridgment in this case. Consequently, we conclude that the trial court did not abuse its discretion in denying counsel's motions to withdraw.

C. *Prosecutor's Opening Statement*

Next, we consider defendant's assertion that the trial court erred in denying his motion for a mistrial based on the prosecutor's description in his opening statement of the expected testimony of a particular witness, Adonis Thompson. As it happened, Thompson never testified at trial. Defendant contends that the prosecutor's opening statement, in which the prosecutor detailed anticipated testimony that later was not admitted and subjected to cross-examination, deprived him of a fair trial.

The legal standards that apply, for purposes of the issue presented, are relatively settled. We review the trial

court's denial of the motion for a mistrial for abuse of discretion. *Bowen*, 340 Or at 508. Even if we conclude that a prosecutor's conduct was improper, a trial court does not abuse its discretion by denying a mistrial unless the effect of the prosecutor's conduct was to deny a defendant a fair trial. *Id.* Generally, a proper jury instruction is adequate to cure any presumed prejudice from a prosecutor's misconduct. *Id.* To be sure, however, statements or testimony that the jury is instructed to disregard can be "so prejudicial that, as a practical matter, the bell once rung, cannot be unrung by such an admonishment." *State v. Jones*, 279 Or 55, 62, 566 P2d 867 (1977) (internal quotation marks omitted). Ultimately, we must decide whether, under the circumstances as a whole, defendant was denied the right to a fair trial, as a matter of law, by the events that transpired at trial. *State v. Compton*, 333 Or 274, 293, 39 P3d 833 (2002), *cert den*, 537 US 841, *reh'g den*, 537 US 1068 (2002).

We begin our analysis by examining the totality of circumstances that bear on whether the prosecutor's opening statement deprived defendant of a fair trial. Before counsel made their opening statements to the jury, the trial court cautioned the jury that those statements were not evidence. Specifically, the trial court stated:

> "Folks, what we're going to do in just a moment is begin the opening statements of the attorneys. Keep in mind the opening statements are not evidence. The evidence is the testimony of witnesses and the exhibits. Opening statements are to give you a roadmap of what the attorneys believe the evidence will be at trial."

The prosecutor then presented his opening statement. That statement included descriptions of the anticipated testimony of several witnesses whom the state planned to call, including Adonis Thompson. With respect to Thompson, the prosecutor told the jury that he expected Thompson, who knew defendant in prison, to testify that defendant had admitted to committing the murders. Thompson was also expected to say that defendant had complained to Thompson that another prisoner, Teal, had "snitched" on him to police, and defendant wanted Thompson to testify that Teal, who was ill, had made up the story to get out of prison early. The prosecutor, while holding a piece of paper in his hand, detailed for the jury the

contents of a note that defendant allegedly had written to Thompson:

> "Adonis Thompson gave us the note. Here's what the note says: 'Say, my brother, this is what I told my lawyers. I told them that you was at OSCI with Ronald Teal and you were walking around the track with him and he said he had that shit and that he was dying and didn't want to die in the penitentiary, so he was going to lie on me and get out. Because he didn't want to die in the penitentiary. Thank you, my brother.' "

After the parties gave their opening statements, the prosecutor advised the trial court that he personally had served Thompson with a subpoena to appear and that the prosecutor had remained in continual contact with Thompson's attorney, but that Thompson had not complied with the subpoena. The prosecutor asked the court to issue a contempt warrant. Defense counsel expressed concern that the prosecutor had referred to Thompson in his opening statement, despite the fact that Thompson's statements were unknown. The trial court asked the prosecutor for his "good faith basis [to believe that] you're going to be bringing him in quickly." The prosecutor explained that he remained optimistic that Thompson would appear, based on his conversations with Thompson's attorney and with a close relative of Thompson's, as well as a voice message that Thompson had left on the prosecutor's answering machine. The prosecutor thought that Thompson just needed an extra couple of days and would be in the area the next day. Defense counsel made no formal motion to the court at that time.

The trial proceeded. Thompson never appeared, and so he never testified. After both sides rested and the case was submitted to the jury, defendant moved for a mistrial. Defendant argued that Thompson's testimony was improperly placed before the jury during prosecutor's opening statements and that defendant was prejudiced by it. In response, the prosecutor asserted that he had had a good faith belief that Thompson would testify, based on the events as they had unfolded up to the time of opening statements. In particular, the prosecutor represented to the trial court that the prosecutor had met with Thompson and his attorney about a week before trial began. At that time, Thompson was in custody on

an unrelated matter and had signed a formal cooperation agreement with the prosecution. Thompson, who assured the prosecutor that he would appear for trial, risked going to prison if he violated that agreement. The prosecutor further told the trial court that, as the trial date approached, the prosecutor attempted to contact Thompson, without success. Just before opening statements, however, Thompson's attorney phoned the prosecutor and informed him that Thompson would contact the prosecutor the day after opening statements. The prosecutor relied on that representation in making his opening statement. When Thompson did not appear as expected, the prosecutor enlisted the help of investigators, who staked out his last known residence and his girlfriend's residence. At some point, police learned that Thompson may have gone to Las Vegas. The prosecutor contacted the Las Vegas Police Department to request that they notify him if they learned Thompson's whereabouts. As to the defendant's concern about the note, the prosecutor explained that he had not been in possession of the note, but instead incorporated its contents in his opening statement based on his recollection of what it had stated. At the court's request, the prosecutor affirmed under oath that everything that he had stated to the court regarding his efforts to secure Thompson's testimony was true.

In his response to the prosecutor's statement, defendant did not take issue with or otherwise challenge the prosecutor's good faith. Defendant continued to argue, however, that the opening statement's reference to Thompson's expected testimony, including the alleged note from defendant, was highly prejudicial. Defendant stated that he was "not asking for a curative instruction, because that's going to double ring the bell."

■■ ■■ The trial court denied defendant's motion for a mistrial. In so ruling, the court made two findings as to the prosecutor's good faith: (1) the prosecutor had a good faith belief that he had secured Thompson's appearance when he presented the opening statement; and (2) the prosecutor made a good faith effort to locate Thompson following his failure to appear pursuant to the subpoena. As to whether the prosecutor's opening statement prejudiced defendant, the court

noted that at least seven witnesses had given testimony similar to what Thompson would have offered, all concerning statements that defendant allegedly had made regarding his involvement in the murders. The trial court offered defendant the opportunity for the following curative instruction:

"My thought was simply to tell the jury that any statements made in opening regarding the testimony of Mr. Adonis Thompson are to be accepted as not true and they're to disregard any reference to him because he was not a witness in this case."

Defendant declined that curative instruction, choosing instead to address the matter in closing argument:

"You heard on opening statement by [the prosecutor] that there was yet another witness here, another witness going to come in here and tell you [defendant] did it. And, in fact, he wrote a letter. [Defendant] wrote a letter to him, and he read the letter to you. The guy's name was Adonis Thompson. Have you seen an Adonis Thompson? Have you seen a letter introduced into evidence here?"

On appeal, defendant argues that the prosecutor's statements concerning Thompson's expected testimony were unduly prejudicial because those statements added weight to the state's case that was not subject to cross-examination and thus denied defendant a fair trial.[20] In support of his argument, defendant principally relies on *Frazier v. Cupp*, 394 US 731, 89 S Ct 1420, 22 L Ed 2d 684 (1969). In *Frazier*, the prosecutor in opening statements summarized the expected testimony of Rawls, a codefendant. *Id.* at 733. As the Supreme Court described the prosecutor's remarks, the summary of Rawls's testimony was not emphasized, took only a few minutes, and was sandwiched in between a description of other evidence. *Id.* The prosecutor also referred to a piece of paper that he was holding to refresh his recollection about something Rawls had stated, which, the prosecutor later acknowledged, the jury might have believed was a written

---

[20] In contrast to defendant's statements to the trial court, defendant now also contends that the prosecutor acted intentionally and in bad faith because the prosecutor had been aware that Thompson might not appear for trial. Defendant's argument regarding the prosecutor's alleged bad faith is not preserved, and we do not consider it. *See State v. Wyatt*, 331 Or 335, 341-47, 15 P3d 22 (2000) (court declined to consider issue not preserved in the trial court).

statement by Rawls. *Id.* at 734. The defendant unsuccessfully moved for a mistrial at the end of opening statements (evidently because the defense knew that Rawls likely would not testify). *Id.* When the prosecutor called Rawls to the stand during trial, Rawls asserted his privilege against self-incrimination. *Id.* The defendant renewed his motion for a mistrial, and the trial court again denied it. *Id.*

In a habeas proceeding before the Supreme Court, the defendant argued that the prosecutor's opening statement concerning Rawls's testimony added weight to the state's case in a form not subject to cross-examination, thus violating his constitutional right of confrontation. *Id.* The Supreme Court disagreed. *Id.* at 735. The Court emphasized that the alleged impropriety occurred during opening statements and that the jury was told that the opening statements are not to be considered evidence. *Id.* The Court also noted that Rawls's statement was not a "vitally important part of the prosecution's case." *Id.* The Court explained:

> "It may be that some remarks included in an opening or closing statement could be so prejudicial that a finding of error, or even constitutional error, would be unavoidable. But here we have no more than an objective summary of evidence which the prosecutor reasonably expected to produce. * * * Certainly not every variance between the advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given."

*Id.* at 736.

In this case, defendant attempts to rely on *Frazier* by distinguishing it. Specifically, defendant asserts that the prosecutor's statement here was far more prejudicial, because the prosecutor detailed Thompson's testimony and appeared to read from the alleged note from defendant. We disagree that the differences in the two cases are appreciable enough to dictate a difference in outcome.

The most important factor in the Supreme Court's decision in *Frazier* was that the statements were part of the prosecutor's opening statements and not part of an evidentiary phase of the trial. The Court emphasized that opening statements pose less danger to a defendant's right to a fair

trial than when inadmissible evidence is placed before the jury during trial because "the jury will ordinarily be able to limit its consideration to the evidence introduced during the trial." *Id.* at 736.[21] The Court did not foreclose the possibility that remarks in an opening statement could be "so prejudicial" as to require a finding of constitutional error. *Id.* at 736. As the Court acknowledged, "[m]any things might happen during the course of the trial which would prevent the presentation of all the evidence described in advance." *Id.* It therefore was unwilling to declare that "every variance between the advance description and the actual presentation constitutes reversible error, when a proper limiting instruction has been given." *Id.* In particular, the Court was unwilling to do so when the objectionable reference was part of the prosecutor's "objective summary of evidence which the prosecutor reasonably expected to produce" and nothing more. *Id.*

Here, as was true in *Frazier*, the reference to Thompson's testimony occurred during the prosecutor's "objective summary" during opening statements about the evidence that the prosecutor expected to produce. Also as in *Frazier*, the prosecutor's statements describing Thompson's expected testimony were included among descriptions of the expected testimony of several other witnesses; no special emphasis was placed on Thompson's expected testimony or its value in establishing defendant's guilt. Just as the trial court in *Frazier* gave the jury an instruction about the purpose of opening statements, *id.* at 735, so, too, did the trial court in this case advise the jury that opening statements were not evidence. Finally, this case involves something that

---

[21] For that reason, this case differs from *State v. Jones*, 279 Or 55, 566 P2d 867 (1977), where this court held that the defendant was denied a fair trial based on the prosecutor's examination of two witnesses during a rape trial. In *Jones*, the prosecutor elicited testimony from two witnesses that the defendant had committed rape "many times" before. *Id.* at 61-62. The trial court instructed the jury to disregard those statements and denied the defendant's motion for a mistrial. *Id.* at 62. Later during the trial, the prosecutor offered evidence of the defendant's criminal record; no record was offered of any prior conviction for rape or any sex offense. *Id.* In reversing the conviction, this court explained that the prosecutor persisted in insinuating that defendant had previously committed rape, knowing that he had no proof of prior rape convictions. *Id.* at 63. In such a case, this court held, the prejudice was so pervasive that the defendant was denied a fair trial. *Id.* The curative instruction did not suffice, because the testimony was so prejudicial that, "as a practical matter, the bell once rung, cannot be unrung by such an instruction." *Id.* at 62 (internal quotation marks omitted).

*Frazier* did not. Specifically, the trial court in this case offered to give a curative instruction that would have been tailored to the statements about Thompson's testimony, one that would have gone so far as to tell the jury to assume that the statements were not true. Defendant declined that instruction.[22]

On balance, we conclude that the prosecutor's summary of Thompson's expected testimony cannot be said to have so prejudiced defendant as to have denied him a fair trial. The trial court therefore did not abuse its discretion by denying defendant's motion for a mistrial.

D.  *Exclusion of Detective Hill's "9-1-1" Report*

The final assignment of error that we address is defendant's claim that the trial court erred in sustaining the state's objection to hearsay testimony concerning Detective Hill's written police report about the contents of the missing recording of the Gattermeir 9-1-1 calls. On appeal, defendant claims that the trial court erred by sustaining that objection, because his inability to examine Norman about Hill's written report deprived him of an opportunity to present a complete defense and therefore violated his right to due process. *See Holmes v. South Carolina*, 547 US 319, 320, 126 S Ct 1727, 164 L Ed 2d 503 (2006) (trial court's authority to exclude evidence is limited by the constitutional guarantee that a criminal defendant have "a meaningful opportunity to present a complete defense" (quoting *Crane v. Kentucky*, 476 US 683, 690, 106 S Ct 2142, 90 L Ed 2d 636 (1986) (internal quotation marks omitted))).

As we noted earlier, Detective Hill, who was deceased by the time of trial, had written a report about her interview with Olivia Gattermeir concerning the substance of her 9-1-1 call. That report was mentioned by the trial court during the pretrial hearing on defendant's motion to dismiss for preindictment delay, in relation to the court's conclusion that defendant was not prejudiced by the loss of the 9-1-1 recording. The trial court also mentioned defendant's own

---

[22] The Supreme Court in *Frazier* noted that a "more specific limiting instruction might have been desirable" in addition to the general pretrial instruction that opening statements are not evidence, "but none was requested." 394 US at 735 (unnumbered footnote). Here, one was offered but declined.

recorded 2003 interview with the Gattermeirs as substitute evidence for the 9-1-1 recording.

At trial, however, defendant did not rely on his own interviews of the Gattermeirs; neither did he seek to have Detective Hill's written report admitted into evidence. Instead, on cross-examination of retired Detective Norman, defendant asked Norman to answer certain questions designed to reveal the contents of Detective Hill's written report. Specifically, defense counsel asked Norman to read to himself a paragraph from Hill's written report, in which Hill had described Olivia Gattermeir's explanation of the sounds she heard coming from Room 24 on the night of the murders, and then asked Norman whether he "had reason to believe that sounds had been reported to 9-1-1 which sounded like pops[.]" The state objected on the ground that the question called for hearsay, and the trial court recessed the proceedings to discuss the matter outside the presence of the jury.

After a conference in chambers, the court instructed the jury to ignore any references during Norman's cross-examination to "pop" sounds:

"THE COURT: Folks, we are going to take a break at this point. There has been talk about a 911 tape. Any substance of that tape is not in evidence yet. Statements regarding pops I'm going to ask you to disregard at this time. The attorneys and I will have a further discussion about that. And questions will be formulated based on a discussion we'll have outside of your presence on the issue of that 911 tape. So for this evening, we're going to take a break."

The next day, the trial court and the parties resumed their discussion of the issue, and the trial court asked the parties how they wanted to handle the matter. The state renewed its hearsay objection, but argued further that, if the court was inclined to allow in any information about the contents of Hill's written report about his interview of Olivia Gattemeir, then the court should admit the "entire context" of the interview. To that end, defendant proposed that Detective Norman be allowed to read paragraphs 2 and 3 of a certain page from Hill's report into the record, which, in defendant's view, would provide the "full content" of the

report. The prosecutor responded, however, that the paragraphs that defendant suggested "would take the matter out of context" and suggested, again, that if the court was going to allow the information in, it was appropriate to have the "entire context" of the conversation put into evidence:

"And here's what I mean by that. To put in paragraphs 2 and 3 only would leave this listener, the jury, with an impression, if not an understanding, that the call, which we do agree was made at 2:55 a.m., the information would be then that the pop, pop or whatever sounds they were and they're described as pop, would have occurred in that general time frame, in the 2:55 time frame.

"That is not the entire context of the conversation that's had with [Olivia] Gattermeir, because the preceding paragraph enlightens us as to when she and her husband did hear that pop, pop. And how it's described is that she says— and I'm going to summarize, and I think I can fairly summarize. But she says she and her husband went to dinner on November 2nd at between 8 and 10 p.m., 8 and 10 p.m. on the 2nd. Upon their return from dinner, Mr. Gattermeir was preparing to take a shower. And that period of time then is 30 to 45 minutes after their return from dinner.

"That's when they heard the pop, pop. So in the context of what is said in its entirety, the pop, pop is heard in that 8 to 10 general time period on the 2nd, as opposed to 2:55 a.m. on the 3rd, two completely different things.

"And so the State, again, we have a general objection to hearsay, but if the Court's going to overrule and allow this information in, it should come in in its entirety, not in part."

The trial court ruled that it would not admit any selective portions of the report or testimony about selective portions of the report, given the state's objection and the fact that the information "does appear * * * to be hearsay." The court observed that defendant had not identified any exception to the hearsay rule that applied. The trial court nevertheless offered defendant the opportunity to argue that "due process requires somehow this evidence comes in." Defendant responded that he was not prepared to make that argument, but asked

"to reserve further argument on that, whether this comes under the residual clause of the hearsay exception, whether

due process requires its allowance of its introduction due to the unavailability of [Detective Hill] and the apparent loss of the evidence.

"So if I could reserve argument on that, I think we could—we could just move on at this point."

The court concluded by reiterating that it would sustain the state's hearsay objection, but that defendant could raise the issue again later in the trial if defendant so chose. Defendant did not renew his effort to introduce either Norman's testimony on the subject or the contents of Hill's report.

■ Now, defendant argues that the trial court's pretrial ruling—*i.e.*, that he did not suffer undue prejudice by the loss of the 9-1-1 recording—and the trial court's subsequent midtrial evidentiary ruling—*i.e.*, that defendant could not elicit Norman's description of Hill's written report, or have selective portions of that report admitted into evidence—were contradictory. Defendant contends that the net effect of the two rulings was to "deprive defendant of his only complete defense" and thus violated due process. Despite the trial court's invitation to do so, however, defendant did not raise a due process argument for the trial court to address or decide. Defendant's constitutional argument is therefore unpreserved.

■ Even if defendant's hearsay objection encompassed a due process objection, the trial court did not err. Defendant's claim that he was deprived of his "only complete defense" rests on his assertion that, in the absence of the actual 9-1-1 recording, Hill's written report provided him with his only means of proving that Flannigan's death may have occurred at a time when he had an alibi. The predicate for defendant's claim is flawed, however. Hill's written report was not defendant's only means of seeking to establish when the Gattermeirs heard the "pop, pop" sounds. Defendant's investigator had contacted and interviewed the Gattermeirs by phone, they could recall the events in question, and they apparently were available as witnesses. Defendant did not, however, seek to use his own investigation in any way.

More fundamentally, however, defendant was not entitled to insist on presenting only selective portions of the

report. When defendant sought to ask Norman about isolated statements in the report, and when the state objected that doing so deprived the statements of their context, defendant offered to introduce only two selected paragraphs in the report. Defendant was unwilling to include other portions that provided added context for the Gattermeirs' explanation of what they heard and when they had heard it. Even assuming that defendant had a due process right to examine Norman about the report, or to introduce the report itself because the 9-1-1 recording had been lost, defendant was not entitled to do so selectively and to preclude the admission of other equally relevant portions of the report. Under the circumstances, the trial court did not err in its evidentiary ruling.

## III. CONCLUSION

For the reasons set out above, we reject defendant's arguments. We therefore affirm defendant's convictions and the sentence of death.

The judgment of conviction and sentence of death are affirmed.

**WALTERS, J.,** concurring.

I concur in the court's decision to affirm defendant's conviction and, with respect to each assignment of error that the court discusses, I concur with its reasoning. Although I also concur in the court's decision to affirm defendant's sentence of death, I must explain more fully.

Defendant raises many arguments as to the constitutionality of the death penalty that this court previously has rejected. I did not participate in those decisions, and although I reserve my right to reconsider some or all of them, I feel constrained, at least in this case, by the doctrine of *stare decisis*. That doctrine requires the balancing of the "undeniable importance of stability in legal rules and decisions" with the "important need to be able to correct past errors." *Stranahan v. Fred Meyer Inc.*, 331 Or 38, 53, 11 P3d 228 (2000).

Recently, jurists who had voted many times to affirm sentences of death have reassessed the constitutionality of

the death penalty in light of their experiences with its administration and objective evidence of the evolving standards of decency. *See Baze v. Rees*, ___ US ___, 128 S Ct 1520, 1551, 170 L Ed 2d 420 (2008) (Stevens, J., concurring) (stating that, in his experience, "the death penalty represents the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes[ ]" (citation omitted)); *Doss v. State*, ___ So 2d ___ , ___ , 2008 WL 5174209, *15-16 (Miss 2008) (Diaz, J., dissenting) (drawing upon judicial and state experience to conclude that despite efforts to limit arbitrary or disproportionate sentences, state system "does not answer Eighth Amendment concerns—it exacerbates them").

This court also has emphasized that the pull of precedent " 'is strong, but it is not inexorable.' " *Stranahan*, 331 Or at 53 (quoting *Hungerford v. Portland Sanitarium*, 235 Or 412, 415, 384 P2d 1009 (1963)). The degree to which any opinion binds future tribunals "depends, of necessity, on [that opinion's] agreement with the spirit of the times or the judgment of subsequent tribunals upon its correctness as a statement of the existing or actual law." *Id*. at 54 (internal quotation marks, citations, and emphasis omitted).

The strength of the bond of an earlier ruling is directly proportionate to the moral and intellectual authority that continues to inform our understanding of that earlier holding. When presented with the opportunity to do so, I urge this court to consider our state's experience in imposing the death penalty and to examine its constitutionality anew.