Argued and submitted December 3, 2018, affirmed April 1, petition for review denied August 27, 2020 (366 Or 826)

MICHAEL ANDRE DAVIS,
*Petitioner-Appellant,*

*v.*

Brandon KELLY,
Superintendent,
Oregon State Penitentiary,
*Defendant-Respondent.*

Marion County Circuit Court
09C22052; A163243

461 P3d 1043

Petitioner appeals a post-conviction judgment that denied post-conviction relief with respect to the guilt phase of his trial. The post-conviction court concluded that trial counsel performed deficiently in three respects: failing to discredit the state medical examiner's conclusion about the time of death based on the gastric contents of one of the victims; acquiescing to the perpetuation deposition of a dying witness and the admission of the videotaped testimony at trial; and failing to establish that a number of the state's witnesses had an opportunity to conspire and fabricate testimony during their overlapping periods of incarceration. The post-conviction court nonetheless denied relief on those claims because it determined that petitioner did not prove that the deficiencies prejudiced him. On appeal, petitioner argues that the post-conviction court's prejudice determination was erroneous and that he is entitled to relief in the form of a new trial. The superintendent defends the court's prejudice determination and cross-assigns error to the court's determinations regarding deficient performance. *Held*: Petitioner failed to demonstrate that trial counsel made an unreasonable decision to agree to perpetuate testimony in exchange for a continuance to better prepare for trial. In light of that earlier choice, and the fact that petitioner was given an opportunity to cross-examine the witness during that deposition, petitioner also failed to demonstrate that subsequent trial counsel made an unreasonable decision by not lodging an objection to playing the videotape at trial—an objection that would have been futile. And, even assuming that counsel's performance was deficient with regard to establishing an opportunity for prisoners to conspire against petitioner and the handling of the medical examiner's testimony regarding time of death, the post-conviction court correctly determined that petitioner failed to prove that those deficiencies could have tended to affect the outcome of the trial.

Affirmed.

Paul G. Crowley, Judge pro tempore.

Andy Simrin argued the cause for appellant. Also on the opening brief were Andy Simrin PC and Peter B. Fahy. Also

on the reply brief on cross-assignment of error was Andy Simrin PC.

Rebecca M. Auten, Assistant Attorney General, argued the cause for respondent. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Lagesen, Presiding Judge, and DeVore, Judge, and James, Judge.

LAGESEN, P. J.

Affirmed.

## LAGESEN, P. J.

Petitioner was sentenced to death for the murder of two people. In this post-conviction proceeding, the post-conviction court granted post-conviction relief as to the penalty phase of petitioner's case but denied relief as to the guilt phase. With regard to the guilt phase, the post-conviction court concluded that trial counsel performed deficiently in three respects: failing to discredit the state medical examiner's conclusion about the time of death based on the gastric contents of one of the victims; acquiescing to the perpetuation deposition of a dying witness and the admission of the videotaped testimony at trial; and failing to establish that a number of the state's witnesses had an opportunity to conspire and fabricate testimony during their overlapping periods of incarceration. The court nonetheless denied relief on those guilt-phase claims because it determined that petitioner did not prove that those deficiencies prejudiced him.

On appeal, petitioner argues that the post-conviction court's prejudice determination was erroneous and that he is entitled to relief in the form of a new trial as to his guilt. The superintendent defends the court's prejudice determination and cross-assigns error to the court's determinations regarding deficient performance. As explained below, we agree with the superintendent that petitioner failed to demonstrate that trial counsel's approach to the perpetuation deposition amounted to deficient performance. And, even assuming that counsel's performance was deficient with regard to establishing an opportunity for prisoners to conspire against petitioner and the handling of the medical examiner's testimony regarding time of death, the post-conviction court correctly determined that petitioner failed to prove that those deficiencies prejudiced petitioner, that is, that they tended to affect the outcome of the trial. We therefore affirm.

## I.  BACKGROUND

### A.  *Underlying Criminal Trial Proceedings*

The Supreme Court's opinion on direct appeal provides a helpful summary of the events giving rise to petitioner's post-conviction case, and we draw from that summary here

unless otherwise noted.[1] *See State v. Davis*, 345 Or 551, 554-63, 201 P3d 185 (2008).

On Sunday, November 3, 1991, the police found the bodies of Phillips and Flannigan inside a motel room at the Ara'Bel Motel. Inside the room, investigators found four .45 caliber shell casings, all of which had been fired from the same pistol, and three spent bullets; a fourth spent bullet was later found in Phillips's body. Investigators also found several personal items and recently purchased food products, but they found no useful fingerprints in the room. *Id.* at 554.

The state medical examiner, Gunson, performed autopsies on both Phillips and Flannigan. Based on the partially digested food in Phillips's stomach, combined with information concerning the time that Phillips last had eaten, Gunson concluded that Phillips had died between 8:45 to 10:45 p.m. or 11:00 p.m. on November 2.[2] Gunson was unable to use the undigested food in Flannigan's stomach to assess her time of death, because Gunson had no information about when Flannigan last had eaten. *Id.* at 555.

Detectives interviewed petitioner shortly after the murders and learned that he had met Flannigan sometime in October 1991 at the Five Spot Tavern where she worked. At the time, petitioner had been living with his half-brother, Foreman. Petitioner and Flannigan had started dating, and they eventually both moved into the apartment of Bynum. According to petitioner, Flannigan stopped returning to the apartment, and petitioner eventually learned that Flannigan had resumed her relationship with her ex-boyfriend (Phillips). A few days later, when Flannigan returned to Bynum's apartment to retrieve her clothing,

---

[1] The Supreme Court explained that it was stating the facts in the light most favorable to the state, which is not the standard that applies to our review of the post-conviction judgment. To the extent that aspects of the trial record now must be viewed differently in light of the issues presented at the post-conviction proceedings, we discuss those aspects of the record later in the opinion.

[2] The Supreme Court's opinion reflects the window described in Gunson's pretrial testimony, 8:20 to 10:20 p.m. At trial, Gunson put the time of death in a two-hour window from 8:45 to 10:45 p.m., "maybe up to 11," as opposed to 8:20 to 10:20 p.m.

Flannigan and petitioner argued about a $500 debt and Flannigan left on foot without her clothing. *Id.* at 556.

Petitioner told detectives that, on the day of the murders, he and Bynum had planned that night to go to a friend's house to watch a Trail Blazers game on television, but that he decided to go home instead. He said that Bynum dropped him off at their apartment between 6:30 p.m. and 6:45 p.m., and that Bynum later called him at the apartment during halftime, between 8:00 p.m. and 8:30 p.m., to tell him that he was not missing anything because the cable TV connection had gone out. Petitioner also told detectives that, between 10:00 p.m. and 10:30 p.m., he drove one of Bynum's cars to a Safeway store, bought beer and cigarettes, and returned to the apartment. Bynum was home when he returned and, a short time later, Foreman arrived at the apartment with a friend. Foreman, his friend, and petitioner then went to the New York Diner, a nightclub, where they remained until closing time, about 2:30 a.m. They then tried to eat at restaurants but the restaurants were too crowded, so they returned to Bynum's apartment between 3:00 a.m. and 4:00 a.m. on November 3. *Id.* at 557.

Bynum gave statements to detectives that were consistent with petitioner's. Bynum also stated that petitioner had taken one of his cars without permission and that Bynum had called Foreman to ask about petitioner's whereabouts, but, as he did, petitioner walked in carrying a 40-ounce bottle of beer. *Id.*

Detectives also interviewed Foreman, who told them that he and two friends—Lowery and Payne—had planned to go to the Trail Blazers game at halftime and watch it in the arena. Foreman said that, when they could not get into the game, they went to the Five Spot between 9:00 p.m. and 9:15 p.m., where Flannigan was dancing. Foreman said he and his friends left the Five Spot soon after Flannigan finished her shift, around 9:30 p.m. and 9:45 p.m., and went to a Safeway store and then to a 7-Eleven store. After that, they dropped Payne off at the University of Portland, went to a McDonald's, and then went to Bynum's apartment sometime between 10:30 p.m. and 11:30 p.m. to pick up petitioner. Foreman stated that the group, including petitioner,

then went to the New York Diner and remained there until 2:30 a.m., then attempted to eat at two restaurants that were too crowded, and finally dropped petitioner back at Bynum's apartment between 4:00 a.m. and 4:30 a.m. on November 3. Detectives got a similar description of events from Lowery. They were not able to locate Payne. *Id.* at 557-58.

 The investigation stalled until 1996, when a person named Grihm, who was facing unrelated criminal charges, disclosed to police that petitioner was involved in the murders. Grihm had been staying in Portland with his sister, who was in a sporadic relationship with petitioner and had lived with him for several years in the mid-1990s. Grihm told detectives that he had overheard two conversations in which petitioner and Grihm's sister talked about Flannigan and Phillips, and that petitioner had admitted killing them. *Id.* at 559-60.

 The investigation then stalled again until a break in April 2002, when detectives learned that petitioner, who had been incarcerated on other charges at the Eastern Oregon Correctional Institution, admitted to an inmate there, Teal, that he had killed Flannigan and Phillips. Detectives interviewed Teal on May 17, 2002, and he informed them that he had been petitioner's weightlifting partner in prison and that petitioner had told him that Flannigan had stolen $70,000 from Bynum and had purchased a Mercedes Benz for Phillips. According to Teal, petitioner had characterized himself as a hit man for Bynum and described in detail how he had murdered Flannigan and Phillips. After interviewing Teal, detectives again interviewed petitioner, and petitioner confirmed that his statements in the previous investigative report were correct. *Id.* at 561.

 By then, Bynum was under investigation for drug trafficking, and detectives reinterviewed him as well. He initially confirmed the statements that he had made to detectives in 1991. But then he negotiated a deal in which the state would agree to a reduction in Bynum's sentence on the drug trafficking charge in exchange for his participation in the murder case against petitioner. At that point, Bynum changed his earlier story in one regard: He reported that he could not remember whether he had telephoned petitioner

during halftime of the basketball game, no longer corroborating petitioner's whereabouts from 8:00 to 8:30 p.m. on the night of the murders. He also added a new admission from petitioner: that, after the 1991 interview with detectives, Bynum had asked petitioner whether he had killed Flannigan and Phillips, and petitioner said, "Yeah, I killed them, Cuz." *Id.* at 561.

Detectives then interviewed another inmate who had been part of petitioner's weightlifting circle in prison, Modaff. Modaff told detectives that petitioner had talked about having problems with a black pimp and a white girl, referring to Phillips and Flannigan, and told Modaff that "I got them motherfuckers." Modaff also reported that their weightlifting circle grew to include Ford and Eddie Lee Davis. Modaff asked petitioner why he had let Ford and Davis join the group, and petitioner replied something to the effect of, "You keep your friends close, and your enemies even closer." Modaff asked what he meant by that, and petitioner explained that he had killed a member of Davis's family. Investigators later confirmed that Phillips was related to Davis. *Id.* at 562-63.

In light of those new developments, police renewed their efforts to locate Payne, who had been with petitioner on the night of the murders but had not previously been interviewed. A detective eventually found him in Helsinki, Finland, and interviewed him by phone in October 2002. Payne told the detective that, on the night of the murders, he had been in Foreman's SUV with Lowery, petitioner, and a fifth person, whom he could not remember, and that Foreman had been driving. Payne said that petitioner had been extremely angry and upset over $500 that Flannigan had stolen from him and used to buy a car for another man. According to Payne, petitioner was "ranting and raving" about how he was going to kill Flannigan and was loading a .45 caliber pistol and telling the others in the vehicle that they had the next 45 minutes to establish an alibi. Payne recalled dropping petitioner off between 9:00 p.m. and 10:00 p.m. at the motel. *Id.* at 562. Payne also told the detective that, shortly after he had learned about the murders in the news, petitioner had threatened to kill him if he

talked to the police. Payne explained that, after that call, he avoided any contact with the police. *Id.* at 563.

Payne returned to Portland from Finland to testify before the grand jury on November 7, 2002, and the prosecutor and detectives reinterviewed Lowery on the same date. Lowery revealed several details that he previously had not told police, including that, after failing to get into the Trail Blazers game at halftime, he and Foreman had met petitioner in the parking lot of a bar across the street from the Ara'Bel Motel between 9:00 p.m. and 10:00 p.m. Lowery said that they drove to the University of Portland without petitioner, dropped Payne off at his dormitory, and went to the New York Diner. While they were there, petitioner called Foreman on his cell phone, and they left to pick him up at Bynum's apartment; on the way there, Foreman told Lowery that petitioner had just killed two people. They then picked up petitioner at Bynum's and returned to the New York Diner, where they stayed until closing. Lowery also told detectives that, after police initially interviewed petitioner about the murders in 1991, Lowery and Foreman constructed an alibi and agreed to tell police the truth about everything that had happened that night, but to leave out the trip to the parking lot across from the Ara'Bel Motel. Lowery said that petitioner later thanked him for providing an alibi. *Id.* at 563-64.

Petitioner was subsequently indicted on eight counts of aggravated murder with a firearm and four counts of aggravated felony murder with a firearm for killing Flannigan and Phillips. A jury found petitioner guilty of all counts and, after a penalty-phase proceeding, the trial court sentenced him to death. On direct and automatic appeal, the Supreme Court affirmed the convictions and death sentence. *Id.* at 593.

B.  *Post-Conviction Proceedings and Issues on Appeal*

Petitioner subsequently initiated this post-conviction proceeding, alleging that his attorneys provided inadequate and ineffective assistance of counsel under Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution, in both the guilt and penalty

phases of his trial. The superintendent conceded below that petitioner was entitled to post-conviction relief with regard to his death sentence, and petitioner has since been resentenced to a life sentence without the possibility of parole.[3] Accordingly, only specifications related to the guilt phase of his trial remain at issue.

As relevant to this appeal, petitioner alleged three ways in which his post-conviction counsel's assistance fell below constitutional standards during the guilt phase of his trial.[4] First, he alleged that his counsel "failed to discredit, by means of an independent pathologist or cross-examination with reference to learned treatises, testimony by medical examiner Karen Gunson regarding her determination of Phillips's time of death on the basis of the contents of his stomach." Second, he alleged that counsel was constitutionally inadequate in failing to object to the state's presentation of videotaped deposition testimony from Teal, a key witness for the state who died before the criminal trial. And, third, he alleged that counsel failed to establish that witnesses like Teal, who claimed that petitioner had confessed to them in prison, had been housed together and had an opportunity "to collaborate in their accusations against him."

After a two-day hearing, the post-conviction court issued a detailed letter opinion in which it agreed with petitioner that trial counsel had performed deficiently in those three respects. But, the court concluded, petitioner was not prejudiced by counsel's failings. The court ruled that the three specifications, whether standing alone or viewed cumulatively, were not "trial outcome-changing issues" in light of the overwhelming strength of the state's case.

---

[3] Petitioner had alleged, and the superintended conceded, that trial counsel failed to investigate and assert that petitioner's mental capacity and level of adaptive behavior rendered him ineligible for the death penalty. The post-conviction court entered a limited judgment on that issue, remanding the case to the trial court for an *Atkins* hearing to determine petitioner's eligibility. *See Atkins v. Virginia*, 536 US 304, 321, 122 S Ct 2242, 153 L Ed 2d 335 (2002). Following that hearing, petitioner was determined to be ineligible for the death penalty, and the parties stipulated to a life sentence without the possibility of parole.

[4] Petitioner raised a number of other specifications of inadequate assistance related to the guilt phase that are not before us.

Accordingly, the post-conviction court entered a judgment denying relief as to the guilt phase of petitioner's trial.

Petitioner appeals that judgment, arguing that the post-conviction court erred in its prejudice assessment. The superintendent defends the post-conviction court's conclusion regarding prejudice and also cross-assigns error to the post-conviction court's rulings as to counsel's performance, which the superintendent argues met state and federal constitutional standards.

## II.   APPLICABLE LEGAL PRINCIPLES AND STANDARD OF REVIEW

Under Article I, section 11, a criminal defendant has a right to a lawyer who provides adequate assistance. To establish that his counsel rendered inadequate assistance within the meaning of that provision, petitioner was required to prove two elements: (1) a performance element—that trial counsel "failed to exercise reasonable professional skill and judgment"; and (2) a prejudice element—in this context, that counsel's failure had "'a tendency to affect the result of his trial.'" *Johnson v. Premo*, 361 Or 688, 699, 399 P3d 431 (2017) (quoting *Lichau v. Baldwin*, 333 Or 350, 359, 39 P3d 851 (2002)). To satisfy the performance prong, a petitioner must prove that counsel's decision "reflects an absence of reasonable professional skill and judgment," a question that "turns on the facts known to counsel at the time that [counsel] made that decision." *Cartrette v. Nooth*, 284 Or App 834, 841, 395 P3d 627 (2017). As for the prejudice prong, "because many different factors can affect the outcome of a jury trial, in that setting, the tendency to affect the outcome standard demands more than mere possibility, but less than probability." *Green v. Franke*, 357 Or 301, 322, 350 P3d 188 (2015).

A functionally equivalent two-element standard governs claims of ineffective assistance of counsel under the Sixth Amendment. *Johnson*, 361 Or at 699. To prevail under the federal standard, petitioner was required to demonstrate that "trial counsel's performance 'fell below an objective standard of reasonableness,'" and also that "there was a 'reasonable probability that, but for counsel's unprofessional

errors, the result of the proceeding would have been differ-
ent.'" *Id.* at 700 (quoting *Strickland v. Washington*, 466 US
668, 688, 694, 104 S Ct 2052, 80 L Ed 2d 674 (1984)).

     In reviewing the post-conviction court's determina-
tions concerning adequate performance and prejudice, our
review "is not open-ended. We review such proceedings for
errors of law," and a "post-conviction court's findings of his-
torical fact are binding on this court if there is evidence in
the record to support them." *Green*, 357 Or at 312. If the
post-conviction court did not make express findings of fact
on all the issues—and there is evidence from which such facts
could be decided more than one way—we will presume that
the facts were decided consistently with the post-conviction
court's conclusions of law. *Id.*

     We examine each of the challenged rulings of the
post-conviction court in light of the foregoing standards.

## III.   DISCUSSION

A.   *Failure to Object to the Presentation of Teal's Deposition
     Testimony*

     The state's case, as recounted above, relied heavily
on evidence that petitioner confessed both murders to vari-
ous inmates, including Teal, petitioner's weightlifting part-
ner at the Eastern Oregon Correctional Institution. Teal
had agreed to cooperate with prosecutors in exchange for
his own early release from prison. He was terminally ill.

     At a pretrial hearing in November 2003, petitioner's
attorneys at the time, Krasik and Shertz, sought to postpone
the trial date that was set for the following March. The pros-
ecutor explained that the state was ready to try the case in
March and objected to petitioner's request for a continuance,
but he also signaled the state's willingness to accommodate
petitioner's motion.[5] The prosecutor explained:

     "And before you ultimately decide, one of the state's
     positions, and all of this has been discussed with counsel,
     one of the state's expected witnesses, a Mr. Ronald Teal,

---

[5]  The prosecutor stated, "[T]here's the table pounding objection and the other
type of objection. And this is that. We are ready. We could try it."

I'm told is quite ill, possibly life threatening illness. And I get this from his parole officer and from a significant other of his. I haven't spoken with him recently.

"*** [Teal] may pass away in the relevant time period in front of us.

"So one of the things the state has let defense know, is that pursuant to ORS 136.080 would ask that before you order this trial altered or different than March, is that we perpetuate Mr. Teal's testimony."

The statute cited by the state, ORS 136.080, provides:

"When an application is made for the postponement of a trial, the court may in its discretion require as a condition precedent to granting the same that the party applying therefor consent that the deposition of a witness may be taken and read on the trial of the case. Unless such consent is given, the court may refuse to allow such postponement for any cause."

Following the state's request, the trial court explained to petitioner that the decision to postpone was ultimately petitioner's but that, "if in fact we do have to set it over, we probably will have to perpetuate this person's testimony. If the person lives, great, we don't use it." The court explained that, even in the case of a deposition, the court would still be ruling "on what is and is not admissible" and that "[w]e will preserve your right to confrontation, which is really an eyeball to eyeball thing. And we'll have to video-tape it in a way so that the witness is visible to the jury. So you really aren't giving anything up. It is your request."

After petitioner was given an opportunity to consult with Krasik and Shertz, petitioner told the trial court that he had no further questions about the matter. Krasik then stated, "We would join in the state's request to perpetuate Mr. Teal's testimony, and do it in a manner that we believe we can work out." The court then asked petitioner again whether he understood why his lawyers were seeking a continuance, and petitioner responded that he understood their reasoning and was satisfied that it was in his interest

to obtain additional time between March and October. The court then stated, "All right. Then with those two under-standings, I would reset it."

Teal's deposition was subsequently taken in court and videotaped, with petitioner present, and subject to cross-examination by Shertz and Krasik; a judge was also present and ruling on objections. Teal died before trial, and the videotaped deposition, in which Teal recounted a confession from petitioner, was later played for the jury. By that time, petitioner had new lawyers, and they did not object when the testimony was played.

In his petition for post-conviction relief, petitioner alleged that counsel was inadequate in failing to "object to the presentation to the jury of the videotaped perpetuation deposition of witness Ronald Teal." At the post-conviction hearing, petitioner argued that an objection to playing the testimony would have been sustained, because it violated petitioner's right to confront witnesses; in his view, even though Teal had been subject to cross-examination by Shertz and Krasik during the deposition, they were no longer part of the defense team at the time of trial, and the two-dimensional image of Teal was no substitute for a living person. Petitioner argued that, in light of the prosecution's focus on Teal—more than 80 references to him during arguments to the jury—he was prejudiced by the lack of an objection to the admission of Teal's testimony.

The post-conviction court agreed that counsel per-formed deficiently, stating that it was not aware of "any legal authority for the perpetuation" apart from the stipu-lation; that the trial court had "failed to ascertain whether Petitioner understood the confrontation clause issues related to agreeing to perpetuated testimony"; and that, "in the absence of any detail of the reasons for a need to continue the case," the decision by Krasik and Shertz to agree to the deposition was unreasonable. The court further explained that, irrespective of the stipulation by Krasik and Shertz, petitioner's trial counsel could have objected to the presen-tation based on the confrontation clause, thereby preserv-ing the issue for appellate review. Thus, the court concluded

that petitioner "has proven error in (i) the initial agreement to the perpetuation and (ii) the failure to object to the evidence being presented at trial."

The superintendent cross-assigns error to that ruling, arguing that the record reflects legitimate, good-faith reasons for Krasik and Shertz to have sought the continuance, that both petitioner and his counsel expressly stipulated to the perpetuation deposition in exchange for the continuance, and that, under those circumstances, a subsequent objection by trial counsel would have been futile. We agree with the superintendent.

The post-conviction court appears to have assessed trial counsels' initial decision to agree to the perpetuation of Teal's testimony based on an erroneous view of the record. The post-conviction court stated that it was required to analyze the reasonableness of the decision "solely on the weight of Teal's testimony and the jurors' inability to make a face-to-face assessment of his credibility," because of the "absence of any detail of the reasons for a need to continue the case." But the trial transcript and court file, which were part of the record before the post-conviction court, detail exactly why petitioner's counsel sought the continuance.

In an affidavit in support of a written motion for a continuance, Shertz laid out the reason for the request:

> "The reason for this request for continuance is: this case when it was charged was already twelve years old. Finding witnesses has been difficult and sometimes impossible. There have been changes in [petitioner's] defense team. More importantly, a case that until two weeks ago had a codefendant no longer has a codefendant because the state chose to dismiss the case against [petitioner's] brother, Edgar Foreman. This has led to a substantial shifting of the legal posture this case is in; evidence which was previously admissible no longer is, witnesses who previously were likely to testify in this case have become irrelevant. In short, we simply need additional time to assess our situation and provide a competent defense to [petitioner]."

Then at the hearing, after the prosecutor explained his objection to moving the trial date, the trial court identified similar reasons that petitioner might need a continuance:

> "[T]wo things happened. One was that [petitioner's code-fendant] Mr. Foreman was removed from the mix, which is really not the defense's fault in any way, shape or form.
>
> "But then also, too, evidence keeps turning up, doesn't it? You wait a bit longer, and Lord knows what will turn up. So there was another reason why you needed the time. It wasn't just the dismissal against Mr. Foreman."

Petitioner's counsel responded, "That's correct, Your Honor."

Thus, contrary to the post-conviction court's ruling, the record reflects why Krasik and Shertz sought the continuance: They believed they needed more time, in light of evidentiary complications and a shift in the legal posture of the case, to provide a competent defense to petitioner. Under those circumstances, it was reasonable for them to conclude that the need for the continuance outweighed the risks of perpetuating Teal's testimony, where petitioner would retain the right to cross-examine Teal, the court would still rule on evidentiary issues, and, as the trial court stated, "If the person lives, great, we don't use it." *See Gorham v. Thompson*, 332 Or 560, 567, 34 P3d 161 (2001) (explaining that strategic decisions will not be second-guessed during post-conviction proceedings unless they reflect "an absence or suspension of professional skill and judgment").

Nor were petitioner's subsequent trial counsel inadequate for failing to object to playing the deposition testimony at trial. Neither the state nor federal constitution requires counsel to advance a futile objection. *See, e.g.*, *Krummacher v. Gierloff*, 290 Or 867, 884, 627 P2d 458 (1981) (stating that "the constitution does not require counsel to make useless and futile gestures for the sake of form"). ORS 136.080, on which the prosecutor and criminal trial court relied, is an express exception to the general rule that "the testimony of a witness shall be given orally in the presence of the court and jury." ORS 136.420(1) (stating the general rule and creating an exception "[i]n the case of a witness whose testimony is taken by deposition by order of the court in pursuance of the consent of the parties, as provided in ORS 136.080 to 136.100"). That exception for perpetuated testimony has existed since before the time of statehood, and our Supreme Court has held that testimony of a witness

obtained pursuant to the statute satisfies Article I, section 11's requirement of "face to face" confrontation "when at some stage of the case against him in a proceeding authorized by law, he is confronted with the witness, and given an opportunity to cross-examine him." *See State v. Bowker*, 26 Or 309, 313, 38 P 124 (1894).[6] The process of perpetuating and admitting the testimony of a since-deceased witness in that manner—with the criminal defendant present, and with an opportunity for cross-examination by counsel—also passes muster under the Sixth Amendment. *See Crawford v. Washington*, 541 US 36, 68, 124 S Ct 1354, 158 L Ed 2d 177 (2004) ("Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a *prior opportunity for cross-examination*." (Emphasis added.)).[7]

In sum, petitioner failed to demonstrate that Krasik and Shertz made an unreasonable decision to agree to perpetuate Teal's testimony in exchange for a continuance to

---

[6] *Bowker*, which involved the statutory predecessor to ORS 136.080, is directly on point:

"But the defendant expressly consenting, in open court, to the taking of Mrs. Vann's deposition, the case was postponed, under the provisions of section 1345 of the Code, until a future day. The deposition of Mrs. Vann was subsequently taken, in the presence of the defendant and his counsel, and on the trial offered in evidence by the state, she having died in the meantime. The objection of defendant to this deposition is based upon the contention that he had a constitutional right, which he could not waive, to meet the witnesses against him face to face on the trial, in the presence of the court and jury. The constitution of this state provides that in all criminal prosecutions the accused shall have the right 'to meet the witnesses face to face.' Article 1, § 11. *But this language does not require that in all cases he shall be confronted with the witnesses on a pending trial. The right secured by the constitution to the defendant is 'to meet the witnesses face to face,' and this requirement is satisfied when at some stage of the case against him in a proceeding authorized by law, he is confronted with the witness, and given an opportunity to cross-examine him.*"

26 Or at 313 (emphasis added).

[7] The post-conviction court also stated that the trial court "failed to ascertain whether Petitioner understood the confrontation clause issues related to agreeing to perpetuated testimony." It is not clear what role that observation played in the court's analysis, but we note that the record reflects that the trial court gave petitioner an opportunity to speak with counsel about perpetuating Teal's testimony, received assurance from petitioner that his counsel had cleared up any questions he had, and then expressly asked petitioner if he understood the reasons for seeking a continuance and was satisfied with those reasons, to which he responded affirmatively. We are not aware of any authority that would require more from the trial court under the circumstances.

better prepare for trial. In light of that earlier choice, and the fact that petitioner was given an opportunity to cross-examine Teal during that deposition, petitioner also failed to demonstrate that subsequent trial counsel made an unreasonable decision by not lodging an objection to playing the videotape at trial—an objection that would have been futile. We therefore conclude that the superintendent's cross-assignment of error is dispositive: Petitioner failed to prove that he was denied adequate or effective assistance of counsel regarding Teal's perpetuated testimony.

B.  *Failure to Establish that Prisoners had an Opportunity to Collaborate in Their Accusations Against Petitioner*

Petitioner's trial counsel sought to discredit Teal's testimony and that of other "inmate witnesses" on the ground that they had lied about petitioner confessing in order to obtain more lenient sentences or early release from prison. His post-conviction petition alleged that counsel should have done more to undermine their testimony by establishing "that prisoners who provided evidence against Petitioner had opportunity to collaborate in their accusations against him"—that is, counsel should have presented the jury with information that the inmates' periods of incarceration had overlapped, thereby giving them an opportunity to propagate a false story about alleged confessions.

In support of that allegation, petitioner presented evidence that Krasik had created a spreadsheet and chart to show where state informants had been incarcerated and at what times, to show "multiple clear pathways for information to be propagated down the line from one to another, and back and forth, and overlaps and who was where when." Krasik had provided that information to his successor counsel, but no evidence or argument related to the chart or housing of inmates was presented at trial.

The post-conviction court agreed with petitioner that his trial counsel performed deficiently by failing to establish a "propagation line":

> "A large part of the State's case was premised upon confessory statements Petitioner made to many people, including the inmate witnesses. In any case involving inmate witnesses, motive to fabricate is a common defense argument.

That a common thread can be woven between the inmates in this case, establishing the prospect of a propagation line, is a unique argument. Under the desperate defense circumstances in this case, the argument should have been made. That is not to suggest that the argument would have prevailed. It would, however, have given the jurors another reason to doubt."

The superintendent cross-assigns error to that ruling, arguing that Krasik's chart itself would not have been admissible because it was hearsay or opinion evidence, and that petitioner therefore did not establish that counsel performed deficiently by not offering it into evidence. The superintendent also argues that, in any event, the post-conviction court correctly ruled that the failure to present a propagation theory had no tendency to affect the outcome of the trial, considering how speculative that theory was on this record. Because we agree with the superintendent with regard to prejudice, we need not address the parties' contentions regarding the performance prong.

We begin our analysis of prejudice with a brief summary of the context in which a propagation theory would have been offered by petitioner. The state presented multiple witnesses who testified that petitioner had talked about the murders at various times, both with inmates and with people who were not incarcerated. The state called six witnesses who had been incarcerated and at some point claimed to have heard petitioner admit to the murders: Teal, Bynum, Modaff, Williams, Wesson, and Weinberger. Two additional witnesses who do not appear on Krasik's chart as inmates, Lowery and Grihm, also testified that they heard petitioner claim to have murdered Flannigan and Phillips.

Faced with that evidence, petitioner's counsel made the decision to acknowledge that petitioner had talked about the murders and was the source of much of the witnesses' knowledge about the case against him. But counsel argued that each of the inmates, in order to obtain a benefit from the state, then traded on that knowledge or other widely available information, inventing additional incriminating admissions. For example, with regard to Teal, counsel explained:

"The point is, is there anything about Mr. Teal's information that is so unique, so unknown to anyone else that by virtue of the fact that Ronald Teal has that information, [petitioner] must have told him *or are we getting caught up in yet another con game.*

"* * * * *

"He tells the detectives and he tells you on the videotape Gerald Phillips is a pimp. Well, how hard is it to add [petitioner] hates pimps. The woman owed him money. [Petitioner] told that to the detectives. [Petitioner] never saw any reason to hide that. That was a fact. He's told the police that in 1991. *So of course when he talks about his case, he's going to tell Ronald Teal that.*"

(Emphases added.)

Given that context—where the jury would have no reason to doubt that petitioner had talked about his case with different inmates—the addition of evidence and argument about a possible "propagation line" could only tend to affect the jury's view of the credibility of the inmate witnesses to the extent it explained something beyond the type of general knowledge of the case that they would have had from conversations with petitioner—that is, to the extent that it would explain either how different witnesses came to know about certain specific admissions they later reported or why and how they would have conspired against petitioner. For a number of reasons, that was not the case here.

First, to the extent that there was any overlap between specific details of the testimony about admissions between Teal, Modaff, and Williams, the jury was already aware of their potential to collude, and petitioner's counsel made that point explicitly in closing. For example, petitioner's counsel pointed out that Teal and Modaff were part of the same weightlifting group and that Modaff was there "when [petitioner] talked to Ron Teal and said, That guy, meaning Eddie Davis, thinks I killed his brother." With regard to Williams, petitioner's counsel argued, "[Williams] tells you that way back when, me and Ron Teal were good buddies and me and Ron Teal had lots of conversations about this case. So we know where his information came from, even if he had any information, we would know where

it came from."[8] Additional evidence and argument about a propagation line would not have added anything beyond what the jury already knew about the credibility of those witnesses or the source of their information about petitioner's admissions.

Second, the post-conviction record does not establish that a propagation theory based on Krasik's chart would have had any likelihood of affecting the jury's assessment of the credibility of the remaining three inmate witnesses—Bynum, Wesson, and Weinberger. It bears emphasis that Krasik's chart and petitioner's post-conviction claim is about establishing the *opportunity* to conspire, not that the witnesses actually associated with one another while imprisoned. That distinction is critical with regard to Bynum, Wesson, and Weinberger.

Bynum, unlike the other inmates, was personally involved in the underlying events, and his version of the murders was diametrically opposed to Teal's (to recall: In Teal's version of events, Bynum authorized the execution of the victims over a financial debt). Under those circumstances, it is not likely that a jury would view Bynum's testimony any differently simply because he overlapped with Teal or other witnesses who testified against petitioner, without any evidence that he in fact associated with or spoke to any of those other inmates.

As for Wesson, Krasik's chart does not show that he was incarcerated at the same time with any other witnesses or informants. The chart reflects that Wesson was released from the Oregon State Penitentiary a few weeks before Weinberger arrived. Moreover, even if there had been an overlapping period of incarceration, it would have been clear to the jury that Wesson and Bynum had an opportunity to share information about the murder. As petitioner's counsel argued during closing:

> "So I questioned [Wesson] directly from a police report written by one of the Portland Police Bureau detectives and

---

[8] He continued, "I'll get to Ronald Teal, but keep in mind that Mr. Williams has already acknowledged discussing in '99, 1999 and 2000 on numerous occasions what it is Mr. Teal says [petitioner] told him."

read to him the statement in there that he had had many conversations with Eddie Bynum about this case. What did he do? He looked at me and he said, No, I didn't. *Yeah, he did.*"

(Emphasis added.) Thus, the jury was presented with a more plausible and direct line of propagation between Bynum and Wesson, and it is implausible to think that a more speculative and convoluted explanation—that they could have encountered and conspired with other inmate witnesses—could have had any tendency to affect the jury's credibility assessment of either witness.

Weinberger was the only inmate witness who, during trial, was not tied to other sources of information besides petitioner, but who is shown on Krasik's chart as being housed at relevant times with other inmates.[9] However, Weinberger's testimony about petitioner confessing to the murders included almost no details of the crimes; in fact, he disclaimed knowing any details:

"[WEINBERGER:]   I think I asked him when he was getting out, and he said that they wanted to give him the rest of his life, they wanted to kill him. And that he was in for two murders and said that I might have read about it in the paper and, you know, I don't read the paper a whole lot, so *I didn't know nothing about his case. And pretty much still don't.*"

(Emphasis added.) According to Weinberger, when he and petitioner were together in the Multnomah County Jail in 2002, petitioner asked him whether he could be convicted on circumstantial evidence. Weinberger testified that, at one point in that conversation, petitioner said, "Yeah, I left no evidence behind." That fact was consistent with testimony by Wesson, but again, Krasik's chart does not show that Wesson overlapped in prison with Weinberger or other inmate witnesses. Weinberger further testified that petitioner later told him that "I'm willing to die for what I believe in. Those two people I killed, I believed they had it coming. I'm willing to die for it." That purported admission—that petitioner would do it again because he believed they had it coming—was

_____
[9] Weinberger is listed by a different name, Hensley.

not repeated by the other witnesses. In that context, evidence that Weinberger overlapped with other witnesses and merely had an opportunity to conspire against petitioner would have done little to cast his testimony in a different light, let alone in a way that could have tended to affect the verdict. The mere possibility that the jury could have seized on a speculative propagation theory is not enough to show prejudice under either the state or federal standard. *Green*, 357 Or at 322; *Johnson*, 361 Or at 700.

For those reasons, we affirm the post-conviction court's denial of relief on the ground that petitioner did not prove that his counsel's failure to establish that prisoners had an opportunity to collaborate in their accusations against him could have tended to affect the jury's verdict.

C.   *Failure to Discredit Gunson's Time-of-Death Testimony*

Last, we address petitioner's claim regarding counsel's handling of expert testimony about the time of Phillips's death. As described above, Gunson, the state medical examiner, testified at trial that, based on the partially digested food in Phillips's stomach, along with information concerning the time that Phillips had last eaten, it was her opinion that Phillips had died between 8:45 p.m. and 11:00 p.m. on November 2. That timeline was significant to the state's case because it substantially overlapped with a window of time for which petitioner had no alibi. In his petition for post-conviction relief, petitioner alleged that counsel was inadequate in failing "to discredit, by means of an independent pathologist or cross-examination with reference to learned treatises, testimony by medical examiner Karen Gunson regarding her determination of Phillips's time of death on the basis of the contents of his stomach."

Petitioner supported that allegation with testimony from Krasik. When deposed as part of this post-conviction proceeding, Krasik testified that he had anticipated Gunson's testimony and consulted with Dr. Brady, who was the state medical examiner before Gunson and had served as her mentor. Krasik testified that he could have effectively cross-examined Gunson with a medical treatise undermining her conclusion but that, in any event, Brady was available and

would have testified that Gunson's gut-content analysis was "scientifically bankrupt."

Petitioner also supported his claim with an affidavit from a specialist in forensic pathology, Dr. Raven, who opined that "[u]tilizing gastric contents to estimate the time of death is an extremely unreliable method," and that there is "no scientific support in the available literature" to support Gunson's estimate of the narrow two-hour window in which Phillips died, because of the myriad variables that influence gastric emptying. Among other problems, "and probably most importantly, the estimate of the time of death is predicated on the statement by a witness of when Mr. Phillips consumed a meal. It is not known if this meal was indeed the last time Mr. Phillips ate prior to his death. He may well have eaten again without the witness' knowledge." From the available data, and without relying on gastric contents, Raven believed that Phillips's time of death could have ranged anywhere from 5:00 p.m. on November 2 to 5:00 a.m. on November 3.

Petitioner argued that counsel's failure to discredit Gunson's analysis, either through cross-examination or the use of an opposing expert, was especially prejudicial because it allowed the prosecutor to use petitioner's own statements against him. The prosecutor had argued in closing:

> "Why is the time line [in which petitioner told detectives that he was alone between 8:00 p.m. and 10:00 to 10:30 p.m.] so important? Up until very recently, no doubt, certainly in 2002 [when petitioner talked to detectives], [he] still did not know, would have no way of knowing what Dr. Gunson knew."

The power of that argument, petitioner contended, had the potential to sway the jury's decision.

The post-conviction court agreed with petitioner that his trial attorneys failed to exercise reasonable skill and judgment in not offering available expert testimony or cross-examining Gunson about the scientific validity of her gastric-content analysis. However, as with the other deficiencies it identified in counsel's performance, the court

concluded that the mistake did not tend to affect the outcome of the trial and denied his claim for post-conviction relief.

Petitioner assigns error to the post-conviction court's prejudice ruling, and the superintendent cross-assigns error to the court's ruling as to counsel's performance. We agree with the court's conclusion regarding prejudice and affirm on that basis. As we will explain, if counsel had discredited Gunson's gut-content analysis through cross-examination or an opposing expert, it would have resulted in a larger window of time in which the murder could have been committed—sometime after Flannigan returned from work after her 9:30 p.m. shift until 5:00 or 5:30 a.m. the next morning. But that expanded window still would have included the period for which petitioner had no alibi (between 8:00 a.m. and 10:00 to 10:30 a.m.), and the hypothetical possibility of a later time of death would have done little under the circumstances to affect the jury's view of (1) other testimony putting petitioner at the scene of the crime during that same time, just before Flannigan would arrive home from work; (2) unchallenged evidence connecting him to the same type of weapon that killed the victims; (3) testimony about petitioner repeatedly confessing to planning to commit or having committed the murders during that same window of time—including testimony by two witnesses, Payne and Lowery, who had no readily discernable motive to fabricate their testimony; (4) or the absence of any evidence or credible theory that the murder actually occurred later, when petitioner had an alibi. It is conceivable, in an abstract sense, that introducing doubt about Gunson's theory of the precise time of death could have allowed defense counsel to point to a gap in the state's proof in that regard and posit hypothetical explanations about the murder having occurred sometime after 10:15 a.m. But the prejudice inquiry requires a petitioner to show something more than that an argument could have been made; the question is whether the petitioner demonstrated something less than a probability but more than a mere possibility that the *ultimate outcome* could have been different. *See Green*, 357 Or at 322; *Richardson v. Belleque*, 362 Or 236, 265, 406 P3d 1074 (2017) (explaining that the "tendency to affect the outcome" standard involves "the

ultimate outcome of the proceedings as to which counsel's deficient performance related"). Petitioner has not done so here.

In assessing the role that counsel's purported deficiency could have played at trial, we first note that Gunson's testimony on time of death was not limited to an analysis of gastric contents. On direct examination, she explained that "the time of death, the determination is based on several aspects that we look at at the scene and then later on at the autopsy. And it's an estimate. It is not—you can't tell exactly when somebody died, but you can estimate that time of death." She explained that it is based on "several aspects of the case," including rigor mortis, post-mortem settling of the blood, and body temperature. Taking into account those factors, she initially estimated the time of death to be between 3:30 p.m. on November 2 and 3:30 a.m. on November 3. Then, accounting for evidence that the investigating officers turned down the heat in the motel room quickly upon discovering the bodies, she testified that the window "might move it ahead a little bit more so that maybe it would be 5:30 on the 2nd to 5:30 in the morning on the 3rd."

After providing that broader window, Gunson then offered the opinion that is the subject of petitioner's post-conviction claim. She testified that "we know basically how long it takes for the stomach to empty of food," so "we look at the gastric contents of everyone we do an autopsy on and decide how much food is there. We actually measure it." Based on the contents of Phillips's stomach, coupled with information supplied by Phillips's girlfriend about when Phillips last ate (between 8:30 p.m. and 8:45 p.m.), Gunson estimated Phillips's time of death to be between 8:45 p.m. and 10:45 or 11:00 p.m.

Petitioner's post-conviction claim is directed solely at the latter, narrower estimate. In fact, petitioner's own expert during the post-conviction hearing offered a time-of-death window very similar to Gunson's estimate of 5:30 p.m. to 5:30 a.m.; Raven opined that the time of death ranged anywhere from 5:00 p.m. on November 2 to 5:00 a.m. on November 3, 1991. And, as a practical matter, there was no dispute that Flannigan was working until 9:30 p.m. on

the night of the murders. Therefore, our prejudice analysis turns on what difference the two different windows could have made to the jury's determination in this case.

As petitioner points out, the prosecutor seized on the narrower window from 8:45 p.m. to 10:45 or 11:00 p.m. during closing, and he emphasized that evidence to the jury because it placed the murder in the window in which petitioner had claimed to have been alone and without an alibi. But Gunson's testimony was hardly the only evidence that the murder occurred in that two-hour window when petitioner lacked an alibi. Rather, all of the most incriminating testimony against petitioner put the murder in that very same window.

Two of the state's most important witnesses, Lowery and Payne, both of whom testified to statements made by petitioner about the murder, placed petitioner near the site of the homicide during the narrower window identified by Gunson. They both testified that they were in an SUV between 9:00 p.m. and 10:00 p.m. near the Ara'Bel Motel when they saw petitioner. Payne testified that he was in an SUV driven by Foreman when Foreman said that he needed to go meet his brother. He testified that they then pulled up to a parking lot where petitioner stepped over to the car. Payne testified that petitioner got in the backseat of the car and "just rants and raves. He's upset about the $500 [that his girlfriend had taken], saying that she bought another person a car." Payne was asked, "What time period? We're after the halftime of the Blazer game. What time period are we talking about at this point?" Payne responded, "Between 9 and 10" and agreed that it was dark outside.

Payne further testified that petitioner "pulls out a .45" and started to load it with bullets, calling Flannigan different names. He testified that petitioner got out of the car and "says that we have 45 minutes to be someplace before the incident, before he kills her." Payne also confirmed that the parking lot where that occurred was near the Ara'Bel; he testified that he later saw the address in a newspaper article about the murder and that it was "the same place we were at" with petitioner in the car, and that the parking lot was "directly across from the motel."

Lowery likewise testified that, around halftime of the Portland Trail Blazers game,[10] Foreman received a phone call and said that "he needs to make a run." He testified that they met petitioner "in that vicinity" of the Ara'Bel. Lowery was asked, "The time period when you had been out to—we saw the pictures here, the Ara'Bel Motel where the blue awning is, do you remember what time frame that was?" He responded, "9, 10." He then responded affirmatively when the prosecutor asked, "Between 9 and 10; is that what you're saying?"

Lowery testified that he later returned with Foreman to Bynum's house, and left with petitioner to go to the New York Diner. Lowery testified that, on the way there, petitioner, who was in the backseat with him, "said he killed two people" with a gun—something that Lowery said that he did not believe until seeing the newspaper the following day. Lowery said that they arrived at the New York Diner around "10:30, 11." Defense counsel did not cross-examine Lowery.[11]

Although defense counsel pointed out some inconsistencies between Payne's and Lowery's recollections and the fact that they had not come forward sooner, the relevant timelines in their testimony were largely consistent. Beyond that, the record does not reveal—and petitioner has not identified—any plausible motivation that either had to fabricate the key parts of their testimony on which they agreed: that they had driven to the Ara'Bel and saw petitioner there between 9:00 p.m. and 10:00 p.m., and that petitioner had made statements implicating himself in the murder.

That time frame, in turn, corresponded with the period in which Bynum testified that petitioner had taken a car from him without permission before returning around 10:00 p.m. or 10:15 p.m., and the undisputed testimony about when Flannigan got off work and would have been

---

[10] An employee of the Trail Blazers, who served as the team's historian and archivist, testified that halftime likely would have begun between 7:56 p.m. and 7:59 p.m. that night.

[11] That is another ground on which petitioner brought his post-conviction petition, but the post-conviction court rejected it. Petitioner has not assigned error to that ruling.

returning home. Phillips's girlfriend, Renfrow, testified that Phillips left their house around 9:10 p.m. or 9:15 p.m. to rush to the Five Spot, which was approximately 20 minutes away, because Flannigan was scheduled to get off work at 9:30 p.m. And, the prosecutor relied on that evidence and Payne's timeline in closing arguments:

> "We know who [petitioner] was with, and we'll get to that as we go on. He was with Edgar Foreman, Josh Lowery, Erik Payne at times, and about 9:35 to 9:45, he was in the Room No. 24 at the Ara'Bel Motel executing in cold blood Gerald Phillips and Belinda Flannigan.

> "* * * * *

> "When does Erik Payne say this happened? November 2nd, 1991, between 9 and 10 p.m. That is exactly when you would expect to find [petitioner] at the Ara'Bel Motel and saying you have 45 minutes if you were at 9:00. The shift ends at 9:30, a few minutes to get there."

In addition to that evidence implicating petitioner in the murder between 9:00 p.m. and 11:00 p.m., the state presented evidence that petitioner and Foreman either threatened or encouraged witnesses to cover up the murders. Payne testified that, about 10 days after the murder, he received a phone call from Foreman, who then put petitioner on the phone. He testified that petitioner "told me not to talk to the detectives if they try and get in contact with me" and that he "threatened that the same thing that happened to them could happen to me." Lowery testified that, after his police interview on November 8, petitioner "thanked me for giving an alibi." Another witness, Ford, testified that petitioner had asked her to say that he had arrived earlier in the evening with Foreman at the New York Diner.

The state also presented testimony from various witnesses who tied petitioner to the same type of weapon used in the murder, a .45-caliber gun. The state's criminalist testified that the spent casings recovered from the murder scene were .45 automatic shell casings. As described above, Payne testified that petitioner was loading a .45-caliber gun in the car just before saying he was going to kill Flannigan, and three other witnesses testified that petitioner carried

something resembling a .45-caliber gun around the time of the murders.

One of those witnesses, Cline, who was a regular at the club where Flannigan danced, also testified that he had seen petitioner and Flannigan arguing in the parking lot of the club two days before her murder. He testified that petitioner was upset that Flannigan wanted to get back together with her previous boyfriend. Petitioner similarly told detectives that Flannigan had returned to her ex-boyfriend who was also her pimp, and Bynum similarly testified that Flannigan and petitioner had "an argument about she wanted her clothes [after moving out], but she owed [petitioner] some money, so he wouldn't give her her clothes until she gave him his money."

In addition, as earlier discussed, the state presented the testimony of seven witnesses besides Payne and Lowery—Grihm, and six people who had been incarcerated with petitioner, who said that petitioner had admitted to the killings.

Petitioner rested without calling any witnesses, instead relying on closing argument to persuade the jury that there was reasonable doubt that petitioner committed the murders. His counsel argued that petitioner lacked a motive ("So if [petitioner] was motivated to kill Belinda Flannigan because he had learned she was with another man, he could have done it that night."); that petitioner's brother, Foreman, "might have been the person in that room"; that various witnesses—Teal, Modaff, Williams, Wesson, and Weinberger, as well as Bynum and Grihm— "are people coming to you primarily as a result of having at some point in time gained a benefit" and did not have any information that was unique or credible; and that, despite a search warrant being executed at Foreman's home, no gun was found. He then turned to some of the most challenging evidence that petitioner faced—the testimony from Payne and Lowery putting him at the Ara'Bel.

Defense counsel acknowledged that Payne "appeared compelling," but he argued that his testimony conflicted with that of Lowery, who did not remember seeing petitioner in

the car ranting about Flannigan and brandishing a .45. He also noted that Lowery had initially agreed with Foreman to not tell the police about their time at the motel, suggesting that he was covering for Foreman rather than petitioner. Counsel further argued that the discrepancy between their testimony resulted because Payne was never "brought into the loop on the alibi" that Lowery and Foreman had agreed upon.

Counsel eventually turned specifically to the time of death, noting that the prosecutor's "strongest argument for that are the stomach contents." Defense counsel argued that evidence from the room suggested that Flannigan and Phillips had perhaps eaten later—that there was evidence of food containers and drinks in the motel room that could have been consumed after Flannigan got off work. Relying on Gunson's testimony, and focusing on the even narrower window that the prosecutor suggested in closing, defense counsel argued that the food "could have been consumed at any time up till 1:30 or 2:30 in the morning, *which places the time of death far outside, far outside this narrow 9:35 to 9:50.*" (Emphasis added.) Counsel added, "Because of that, we don't know what to make of Karen Gunson's testimony regarding time of death. That is the one variable that she hung her hat on because she knew there was information Gerald Phillips had eaten at 8:15 or 8:30."

Petitioner then presented a timeline to the jury that attempted to show why he believed it was impossible *for petitioner* to have committed the murder between 9:35 p.m. and 9:50 p.m. He argued that, "[i]n their efforts to squeeze down this timeline, you have literally been told that this crime took place within a 15-minute time span, that it had to have. Because otherwise, this and that wouldn't fit"—specifically, that if Bynum called petitioner at home in Beaverton during halftime, which started about 8:00 p.m. and lasted 20 minutes, the phone call could have come as late as 8:20 p.m.; petitioner was required to drive about 20 minutes to the Ara'Bel, then place a call from a phone booth to Foreman, who left the New York Diner in Beaverton and drove to the Ara'Bel and talked to petitioner for five or 10 minutes; and if Flannigan arrived home around 9:50 p.m., it meant that "petitioner comes into the room, does what the State says

he did, comes back out to his car, this borrowed car, and drives all the way back to Beaverton and arrives there not later than 10:15 to 10:30. That can't be done. Simply can't be done."

We draw several conclusions from the way that that evidence and those arguments were presented. First, the state presented a volume of evidence tying petitioner to the murders, in the way of circumstantial evidence of motive, opportunity, weapon, and purported admissions to the crimes, which were consistent with the murder occurring somewhere between 9:30 p.m. and 10:00 p.m. Second, petitioner's defense, as a practical matter, required the jury to doubt the testimony of two witnesses, Payne and Lowery, who placed petitioner at the scene of the murder at that time, and his strategy as to those witnesses was to suggest that they were for some reason covering for the actual murderer, Foreman—a person who was *with* petitioner after 10:00 p.m. and would have had the same alibi if the murders had been committed later. And, third, to the extent that petitioner posited a theory that the murder may have occurred later than 10:00 p.m., it actually took advantage of Gunson's testimony that time of death can be determined from gut contents: that Flannigan and Phillips had eaten at the motel room, fixing the time of death two hours after that meal.[12]

Petitioner has not demonstrated, given that context, how the jury's assessment of the weight of the evidence implicating petitioner in the murders could have turned in any meaningful way on Gunson's narrowing of the time of death, or that cross-examination or an opposing expert on that point—which would have still left the broader 12-hour window that Gunson and Raven identified—could have had any tendency to affect the outcome. Given the volume and breadth of the state's evidence about when the murder likely occurred and petitioner's involvement, petitioner failed to demonstrate any likelihood that the jury's determination

---

[12] The Supreme Court's opinion on direct review describes the content of two 9-1-1 calls from a neighboring room that, according to the Ara'Bel's phone records, were made closer to 3:00 a.m., but that, according to the callers, concerned "loud pops" that occurred much earlier in the evening. *See Davis*, 345 Or at 555. At trial, only the fact of the Ara'Bel's records of two 9-1-1 calls—and not the content of the calls—was ultimately admitted.

of the credibility of Payne or Lowery, or any other witness, turned on the fact that their timeline about petitioner's involvement matched the window offered by Gunson. Again, the prejudice inquiry does not require a probability that the outcome would have been different, but it also requires something more than an abstract possibility. And we are confident, based on this post-conviction record, that the jury would have reached the same verdict if it had been told instead, either through cross-examination or an opposing expert, that the murder could have occurred anytime between 5:00 p.m. and 5:00 a.m. the next morning, which still would have included the same period that Payne or Lowery placed petitioner at the Ara'Bel, when Flannigan would have returned from her 9:30 p.m. shift. If anything, testimony undermining the reliability of gut-content analysis would have undercut one of the theories petitioner used to attempt to sow doubt—the possibility that Phillips and Flannigan ate in the motel room after their return, meaning that the time of death must have been two hours later, during the period in which petitioner had an alibi.

For those reasons, we conclude that this case is distinguishable from others in which courts have concluded that counsel's ineffective handling of expert testimony resulted in prejudice.[13] In this case, given the role that Gunson's gut-content analysis played in the case as a whole, petitioner failed to demonstrate that there was any risk that that analysis, or the absence of contrary testimony about that analysis, affected the jury's verdict. We therefore affirm the post-conviction court's judgment with regard to

---

[13] *E.g.*, *Jackson v. Franke*, 364 Or 312, 322, 434 P3d 350 (2019) (holding that counsel's failure to object to the admission of expert testimony was prejudicial, because it created more than a mere possibility that such evidence influenced the determination of guilt in light of the risk that jurors could be "overly impressed or prejudiced" by "a credentialed expert, surrounded with the hallmarks of the scientific method" (internal quotation marks and citation omitted)); *Farmer v. Premo*, 363 Or 679, 701-02, 427 P3d 170 (2018) (concluding that there was more than a mere possibility that the verdict had been affected by counsel's failure to present expert testimony that a gun found at another suspect's home was "likely" the murder weapon; that testimony "could have been significant," where, among other things, there was evidence that the other suspect resembled the shooter, the petitioner's admissions to the murder differed from forensic evidence, and there was evidence that cast doubt on the reliability and credibility of witnesses identifying the petitioner and placing him in the area before the shooting).

that specification of inadequate and ineffective assistance of counsel.

## IV.  CONCLUSION

In summary, we conclude that petitioner failed to demonstrate that trial counsel's approach to the perpetuation deposition amounted to deficient performance. We further conclude that, even if counsel's performance was deficient with regard to establishing an opportunity for prisoners to conspire against petitioner and handling of Gunson's gut-content analysis, the post-conviction court correctly determined that petitioner failed to prove that those deficiencies prejudiced petitioner. Accordingly, we affirm the post-conviction court's judgment.

Affirmed.